

**FILED**

May 26 2017, 6:11 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEES

Amy D. Griner
Mishawaka, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Indiana Department of Child Services, <br><br> *Appellant-Defendant,* <br><br> v. <br><br> J.D., R.B., et al., <br><br> *Appellees-Plaintiffs* | May 26, 2017 <br><br> Court of Appeals Case No. 71A03-1611-JC-2627 <br><br> Appeal from the St. Joseph Probate Court <br><br> The Honorable James N. Fox, Judge <br><br> The Honorable Graham C. Polando, Magistrate <br><br> Trial Court Cause No. 71J01-1606-JC-443 |

**Altice, Judge.**

**Case Summary**

[1] The Indiana Department of Child Services (DCS) appeals from the trial court's denial of their petition alleging that M.B. (Child) was a Child in Need of Services (CHINS). On appeal, DCS argues that the trial court's order was contrary to law.

[2] We reverse and remand for further proceedings consistent with this decision.

**Facts & Procedural History**

[3] R.B. (Mother) gave birth to Child on April 19, 2016. J.D-O. (Father) established his paternity by executing a paternity affidavit shortly after Child's birth. Mother and Father were no longer together at the time of Child's birth, and Child resided with Mother and her boyfriend, L.M.

[4] On the evening of June 24, 2016, DCS received a report that Child had been seen in the emergency room and found to have multiple fractures, including several fractured ribs. In response to the report, DCS Family Case Manager (FCM) Bridget Murray went to the hospital and spoke to Mother and Child's doctors. Mother told FCM Murray that Child did not attend day care and that she, L.M., and Father were the only adults with access to Child. Mother further stated that the previous day, Child had fallen asleep in his car seat during a trip to the grocery store, and when Mother removed him from the seat after he woke up approximately two hours later, he cried out in pain. Mother also stated that she heard a crackling sound coming from Child's chest, his breathing did not seem normal, and he began to vomit after feedings. Mother told FCM Murray that after doing some internet research, she learned that a

broken rib was a potential cause of Child's symptoms. Mother took Child to his primary care physician the next day and asked that he be x-rayed. Because Child's x-rays revealed possible rib fractures, he was transferred to the emergency room for further testing. A bone survey performed at the emergency room revealed five fractured ribs, a fractured right tibia, and a possible fracture to the left radius. A physician advised FCM Murray that it was not feasible that Child's injuries could have been the result of simply being removed from his car seat, and that the pattern of rib fractures was consistent with Child having been squeezed.

[5] Based on the information FCM Murray gathered, she concluded that Child's injuries were non-accidental and that it was necessary to remove Child. Upon his release from the hospital on June 25, 2016, Child was placed in foster care. A detention hearing was held on June 27, 2016, at which the trial court authorized Child's continued placement outside the home. On the same date, DCS filed its petition alleging that Child was a CHINS.

[6] A fact-finding hearing was held on August 2 and 16, 2016. At the hearing, FCM Murray testified concerning the events leading up to Child's removal and his placement in foster care. FCM Murray further testified that the foster parent took Child back to the emergency room on June 28, 2016, because he was making the same crackling sounds he had originally presented to the emergency room with prior to his removal, and she was concerned about his breathing. No further scans were conducted on that date and Child was discharged.

[7] Additionally, three physicians testified and opined that Child's injuries were non-accidental. Dr. Russell Midkiff, the radiologist who read Child's bone survey at the emergency room, testified that he was "very certain" that Child's injuries were the result of non-accidental trauma. *Transcript* at 51. Specifically, the posterior rib fractures on both sides of Child's body were indicative of being "picked up and held very tightly in hands[.]" *Id.* at 53. Dr. Midkiff also identified four corner fractures, which he explained are small fractures at the ends of the bones near the growth plates that are "very unusual" and consistent with a "whiplash motion" in a child's extremities caused by being shaken. *Id.* at 56. Dr. Midkiff testified that the posterior rib fractures and the corner fractures "have very high specificity for non-accidental trauma" and "almost basically never occur accidentally." *Id.* at 47. Dr. Midkiff also explained that he was "very confident" that Child did not suffer from any medical condition that could have explained his injuries. *Id.* at 48. He noted specifically that children with osteogenesis imperfecta, also known as brittle bone disease, have decreased bone density, but Child had normal bone density.

[8] Dr. Midkiff testified further that he was able to identify additional fractures in a follow-up bone survey conducted on July 14, 2016. Dr. Midkiff testified that follow-up scans are recommended because new fractures "can be quite subtle[,]" but healing bones are easier to identify. *Id.* at 49. Because all bones will start to show evidence of healing within two weeks, a follow-up scan is performed at least two weeks after the first "so you'll be able to see any healing fractures that might have been not appreciated on the initial bone survey." *Id.*

Dr. Midkiff had initially identified fractures of the eleventh and twelfth ribs on the right and the seventh, eighth, and ninth ribs on the left. On the follow-up scan, he was able to identify additional fractures of the ninth and tenth ribs on the right and the tenth rib on the left, as well as a fracture in the clavicle. Dr. Midkiff testified that when he went back and reviewed the June 24 bone survey after reading the July 14 follow-up scan, he was able to see the clavicle fracture and one of the previously unidentified rib fractures on the right on the earlier scan, although they were not as easily visible at that time. Dr. Midkiff testified that Child's fractures were in different stages of healing, which indicated at least two separate incidents of trauma.

[9] Dr. Nicole Davis Riordin, the physician who treated Child when he was seen at the emergency room, also testified at the fact-finding hearing. Dr. Riordin testified that Mother was unable to provide an explanation as to how Child was injured. Mother told Dr. Riordin that Child had not been out of her care and had not sustained any trauma. Dr. Riordin testified that it was not possible for Child's injuries to have been caused by being lifted out of a car seat. Dr. Riordin acknowledged that some of Child's laboratory tests showed abnormal results, but testified that those results did not suggest a metabolic deficiency or bone disorder. Dr. Riordin testified that she believed Child's injuries were non-accidental.

[10] Dr. Shannon Thompson, a Child Abuse Pediatrician at Riley Hospital for Children, also testified that she was "very certain" that Child's injuries were not accidental. *Id.* at 88. Dr. Thompson noted that Child's rib fractures were

posterior and there were "multiple rib fractures and they're all in order." *Id.* at 87. According to Dr. Thompson, "[t]hat specific pattern is highly specific to child abuse because there's only one way that can occur which is . . . front to back impression." *Id.* With regard to Child's fractured clavicle, Dr. Thompson testified that direct force against the collar bone itself or indirect force, such as when a toddler trips and extends an arm to stop the fall, was necessary to produce such an injury. She explained further that in a very young infant like Child, such indirect force is not a plausible mechanism for such an injury. Dr. Thompson also testified that she observed only one corner fracture on Child's bone surveys rather than the four that Dr. Midkiff had identified.

[11]    Dr. Thompson testified that there was "very little suspicion" of a bone disorder because Child had no medical problems since delivery and because his bones did not look "washed out" on his x-rays. *Id.* at 85. Dr. Thompson further stated that genetic bone diseases are very uncommon and although there are blood tests available for such disorders, it was reasonable not to conduct such tests in this case in light of the tests already performed and the medical records available to hospital staff. Dr. Thompson also testified that Child's pattern of fractures were not consistent with a bone disorder. She testified that with a bone disorder, "[t]he kind of fractures you typically see might be one single rib fracture or fractures of the shaft of the bone or the shaft of the ulna or the shaft of the tibia. Not the end of the bone and not rib fractures right in a row posterior like and at different ages like we're seeing in this infant." *Id.*

[12] Mother, Father, and L.M. also testified at the fact-finding hearing. Father testified that his last unsupervised visit with Child had been on June 11, 2016, and it did not appear that there was anything wrong with Child at that time. Father denied dropping or hitting Child or otherwise causing his injuries. L.M. testified that he had never observed any injuries or odd behavior from Child. L.M. testified further that he was out of town for work on June 23, 2016, when Mother called him "freaking out" about a crackling noise coming from Child's back. *Id.* at 120. Mother testified that she had no concerns that Father, L.M., or L.M.'s children had harmed Child. She testified further that she had taken Child to his two-month checkup on June 22, 2016, and nothing appeared to be wrong with him at that point. Mother stated that when she took Child out of his car seat following a trip to the grocery store on June 24, 2016, he began screaming very loudly and remained unusually fussy throughout most of the night. Mother testified that when she took Child to the doctor the next day, the physician initially did not think anything was wrong with Child, but realized there was a problem when Mother asked him to feel Child's back. Mother testified that she was the one who requested an x-ray, which led to Child being transferred to the emergency room and the discovery of multiple fractures. Mother testified that Child had never had an injury or fall while in her care and she denied doing anything to harm Child.

[13] At the conclusion of the evidence, DCS argued that it had presented sufficient evidence to trigger the presumption, pursuant to Ind. Code § 31-34-12-4, that Child was a CHINS. After a recess, the trial court orally denied the CHINS

petition from the bench and ordered Child returned to Mother's care.[1]  DCS

filed a motion to correct error on September 15, 2016.  The motion was deemed

denied pursuant to Ind. Trial Rule 53.3 when the trial court failed to set a

hearing or rule on the motion within forty-five days.  DCS now appeals.

Additional facts will be provided as necessary.

## Discussion & Decision

[14]     On appeal, DCS argues that the trial court committed reversible error in

denying the CHINS petition.  Specifically, DCS argues that the trial court

committed legal error by failing to give effect to the presumption set forth in

I.C. § 31-34-12-4 (the Presumption Statute).  DCS also argues that the trial

court committed legal error when it rejected the physicians' testimony that

Child's injuries were non-accidental.

[15]     This court will not set aside the findings or judgment in a CHINS proceeding

unless clearly erroneous.  *In re Des. B.*, 2 N.E.3d 828, 836 (Ind. Ct. App. 2014)

(citing Ind. Trial Rule 52(A)).  The clearly erroneous standard is defined based

upon whether the party is appealing a negative or an adverse judgment.  *Serenity

Springs v. LaPorte Cnty. Convention & Visitors Bureau*, 986 N.E.2d 314, 319 (Ind.

Ct. App. 2013).  "A negative judgment is one entered against a party who bears

the burden of proof, while an adverse judgment is one entered against a party

---

[1] The trial court also entered a written "CHINS Fact Finding Order" on the same date it denied the petition. *Appellant's Appendix* at 8.  The order did not, however, contain any written findings of fact.

defending on a given question." *Id.* (quoting *Garling v. Ind. Dep't of Natural Res.*, 766 N.E.2d 409, 411 (Ind. Ct. App. 2002), *trans. denied*). Because DCS bore the burden at trial of proving by a preponderance of the evidence that Child was a CHINS, it is appealing from a negative judgment. *See In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010); I.C. § 31-34-12-3. On appeal, we will reverse a negative judgment only where the trial court's decision is contrary to law. *Kotsopoulos v. Peters Broadcast Eng'g, Inc.*, 962 N.E.2d 97, 105 (Ind. Ct. App. 2011). "In making the determination whether a trial court's decision is contrary to law, we must determine if the undisputed evidence and all reasonable inferences to be drawn from that evidence lead to but one conclusion, and the trial court has reached a different conclusion." *Id.* Additionally, a judgment is clearly erroneous if the trial court applies the wrong legal standard. *Town of Fortville v. Certain Fortville Annexation Territory Landowners*, 51 N.E.3d 1195, 1198 (Ind. 2016).

[16] DCS alleged that Child was a CHINS pursuant to I.C. § 31-34-1-2, which provides in relevant part as follows:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental health is seriously endangered due to injury by the act or omission of the child's parent, guardian, or custodian; and
>
> (2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

Additionally, the Presumption Statute provides that:

A rebuttable presumption is raised that the child is a child in need of services because of an act or omission of the child's parent, guardian, or custodian if the state introduces competent evidence of probative value that:

(1) the child has been injured;

(2) at the time the child was injured, the parent, guardian, or custodian:

(A) had the care, custody, or control of the child; or

(B) had legal responsibility for the care, custody, or control of the child;

(3) the injury would not ordinarily be sustained except for the act or omission of a parent, guardian, or custodian; and

(4) there is a reasonable probability that the injury was not accidental.

I.C. § 31-34-12-4. The purpose of the Presumption Statute is clear. In cases where a child has injuries that suggest neglect or abuse, it shifts the burden to the party most likely to have knowledge of the cause of the injuries—the parent,

guardian, or custodian—to produce evidence rebutting the presumption that the child is a CHINS. The importance of the Presumption Statute is underscored in cases such as this one, where the injured child is too young to speak for himself.

[17] When it denied the CHINS petition from the bench, the trial court made the following statements:

> There's no doubt that we have serious, and I can't help but note, probably very painful injuries to this child. The question is why and how this child got injured. We have the presumption statute . . . to which [the DCS attorney] eluded [sic] for this very reason. The Department can't get into the home beforehand, obviously, and can't, consistent with the 5th Amendment, anyway, coerce a mom or whoever the care-taker is into talking and so there's essentially the form of res ipsa loquitor [sic] if the Court finds that this injury would not have ordinarily been sustained absent abuse or neglect. Intuitively, that seemed to be the case here. As fragile as children are, it is very, very hard, as the Doctors indicated and as common sense would indicate to break a child's bones. Especially a child of this age and at this level of development. And the Doctors, indeed, confirmed that this [is] in fact such an injury. The question is the weight to be given their testimony. I am not going to second guess a Doctor on medicine for a variety of reasons. But I will second guess them on the law and, quite frankly, they seem to have ventured there in this case. They repeatedly characterized the injuries as non-accidental. When the idea that they can determine such a thing is, I think, frankly absurd. It completely rules out the possibility of a negligent injury to the child and given the evidence I've heard, that is the most consistent explanation that's also consistent with abuse or neglect. Especially given that mom did seek fairly immediate care. I find mom credible when she said she did not intentionally harm this child. And I can not find the Doctor's opinions as to how these were sustained, as opposed to the fact that they exist, incredible [sic]. Therefore, I can not find

> that this child is in need of services. This child is discharged to
> mother's care. Thank you.

*Transcript* at 148.

[18] These statements are problematic in a number of ways. It is apparent from the trial court's statements that it found that DCS had not set forth evidence sufficient to trigger the application of the Presumption Statute because it had not introduced evidence establishing a reasonable probability that Child's injuries were not accidental. In doing so, the trial court rejected the physicians' unanimous opinions. Although a fact-finder is not obligated to credit expert testimony, in this case the trial court's statements make it clear that its decision was driven by a misunderstanding and misapplication of the law.

[19] As an initial matter, the trial court stated that whether Child's injuries were non-accidental was a question of law. The manner in which Child was injured, and specifically whether the injuries were non-accidental, is a question of fact. The trial court's mischaracterization of this issue as a question of law is of particular concern because it effectively required the court to disregard the physicians' testimony that Child's injuries were non-accidental. *See Vaughn v. Daniel Co. (West Virginia), Inc.*, 841 N.E.2d 1133, 1137 (Ind. 2006) (explaining that "Indiana Evidence Rule 704 permits opinions to embrace ultimate issues to be decided by the trier of fact, but prohibits opinions as to legal conclusions").

[20] Furthermore, although the trial court gave no indication that it questioned the qualifications of the physicians who testified in this case, the court appears to

have concluded that physicians are, as a matter of law, unqualified to opine as to whether injuries are non-accidental. The trial court went so far as to call the idea that trained medical professionals can determine whether an injury was inflicted non-accidentally "frankly absurd." *Transcript* at 148. We emphatically reject this approach.

[21] Identifying the cause of a patient's injuries is a matter squarely within the purview of medical science. Indeed, in many cases, doctors or other medical professionals with the appropriate training and experience will be the only individuals with the expertise required to understand and explain the biomechanical forces necessary to produce certain types of injuries. Such testimony is of particular importance in cases such as this one, where a very young infant has numerous serious injuries for which the parents have provided no plausible explanation. The trial court's view also overlooks the fact that doctors routinely testify concerning whether injuries are accidental and Indiana appellate courts regularly rely upon such testimony. *See, e.g., Childers v. State*, 719 N.E.2d 1227, 1230 (Ind. 1999) (noting, in its consideration of the sufficiency of the evidence to support a murder conviction, that a forensic pathologist testified that the three-year-old victim "could not have injured himself in this manner; rather, these were 'non-accidental injuries'"); *In re J.S.*, 906 N.E.2d 226, 233 (Ind. Ct. App. 2009) (citing a medical diagnosis report indicating that the child's injuries were "non-accidental" in support of a finding that the evidence was sufficient to justify the termination of parental rights). *See also* Ann M. Haralambie, *Handling Child Custody, Abuse and Adoption Cases* § 17.4

(3d ed. 2009) (explaining that expert testimony is required to prove that a fracture occurred non-accidentally and that "[a] radiologist (especially a pediatric radiologist), orthopedist, pediatrician, or emergency room physician are the experts most often called to testify about the nonaccidental nature of the fracture"). Although a fact-finder is not required to credit a particular physician's opinion as to the cause of a child's injuries, to conclude that all such testimony is improper or inherently lacking probative value would undermine numerous criminal convictions and civil judgments and leave vulnerable children at risk for further abuse by creating a virtually insurmountable evidentiary obstacle for DCS in some CHINS cases.

[22] The trial court's statements also suggest that it imposed an inappropriately high evidentiary burden on DCS to trigger the Presumption Statute. The statute requires only "competent evidence of probative value" of the circumstances set out therein. I.C. § 31-34-12-4. Black's Law Dictionary defines "competent evidence" by cross-reference to the definitions for "admissible evidence" and "relevant evidence." *Black's Law Dictionary* (10th ed. 2014). Admissible evidence is defined as "[e]vidence that is relevant and is of such a character (e.g., not unfairly prejudicial, based on hearsay, or privileged) that the court should receive it." *Id.* "Relevant evidence" is defined as "[e]vidence tending to prove or disprove a matter in issue." *Id.* "Probative evidence" is likewise defined as "[e]vidence that tends to prove or disprove a point in issue." *Id.* Thus, DCS need only produce some relevant and admissible evidence tending

to establish the elements of the Presumption Statute in order to shift the burden of production to the parents or custodians.

[23] In this case, DCS undoubtedly did so. There is no question that Child was seriously injured, and the evidence presented at the fact-finding hearing established that from the time of his birth until his removal, Child was continuously in his parents' care.[2] Additionally, three physicians concluded based on their training and experience that Child's injuries were non-accidental and indicative of child abuse. This evidence was competent and probative, and therefore sufficient to trigger the application of the Presumption Statute and shift the burden of producing evidence to rebut the presumption to Child's parents.

[24] In light of the legal errors committed by the trial court, we need not address Mother's arguments that the denial of the CHINS petition was nevertheless supported by the evidence. Because we cannot say with confidence that the trial court's legal errors did not affect its ultimate decision in this case, we

---

[2] Mother argues that DCS did not establish that Child was injured in her care because Father had unsupervised visitation with Child prior to the discovery of his injuries. We note, however, that the possibility that Child was injured while in Father's care would not affect the applicability of the Presumption Statute. There is no dispute that from the time of his birth until the discovery of his injuries, Child was at all times in the care and custody of a parent. *See In re N.E.*, 919 N.E.2d 102, 106 (Ind. 2010) (explaining that a CHINS determination "establishes the status of a child alone" and "a separate analysis as to each parent is not required in the CHINS determination stage").

In any event, DCS presented competent and probative evidence tending to prove that at least some of Child's injuries occurred in Mother's care. Father's last visit with Child had been on June 11, 2016. Dr. Thompson testified that based on the rate of healing shown on Child's x-rays, at least some of the fractures occurred after that date. Thus, Dr. Thompson testified that Father could be ruled out as having caused the most recent fractures. Dr. Midkiff testified that it was possible, but very unlikely that Child could have sustained his most recent fractures on or before June 11.

reverse the trial court's denial of the CHINS petition and remand with instructions to conduct further proceedings consistent with this decision.[3]

Judgment reversed and remanded with instructions.

Kirsch, J. and Mathias, J., concur.

---

[3] Because the issue may arise on remand, we note that the Presumption Statute creates a rebuttable presumption "that the child is a [CHINS.]" I.C. § 31-34-12-4. Accordingly, the presumption applies to all elements of I.C. § 31-34-1-2. In other words, there is a rebuttable presumption not only that Child's physical or mental health is endangered, but also that Child needs care, treatment, or rehabilitation that he is not receiving and is unlikely to be provided or accepted without the coercive intervention of the court.