## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 20 2017, 10:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Glen E. Koch II
Boren, Oliver & Coffey, LLP
Martinsville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Katherine A. Cornelius
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Guardianships of Ja.R.J.,[1] Je.R.J, and Ju.R.J., Minor Children, <br><br> H.L.R., <br><br> *Appellant-Petitioner,* <br><br> v. | December 20, 2017 <br><br> Court of Appeals Case No. 40A01-1706-GU-1297 <br><br> Appeal from the Jennings Circuit Court <br><br> The Honorable Jon W. Webster, Judge |

---

[1] We recognize that H.L.R. is not appealing the juvenile court's denial of his petition for guardianship as to minor child Ja.R.J. However, because Ja.R.J. was one of three siblings over whom H.L.R. had requested guardianship appointment at the trial court level (Cause Nos. 40C01-1608-GU-28, -29, -30), we find it appropriate to include her in the caption pursuant to Indiana Trial Rule 17(A), which provides that a party of record in the trial court shall be a party on appeal.

| Indiana Department of Child Services, | Trial Court Cause Nos. 40C01-1608-GU-29 40C01-1608-GU-30 |
|---|---|
| *Appellee-Intervenor*. | |

**Kirsch, Judge.**

[1] H.L.R. sought to be appointed as guardian for his former step-grandchildren, three siblings: Ja.J., Je.J, and Ju.J. The trial court denied his request, and H.L.R. now appeals that decision as to Je.J. and Ju.J. (together, "Brothers"). He raises one issue that we restate as: whether the trial court's decision to deny H.L.R.'s petitions to establish guardianship over Brothers was contrary to law.

[2] We affirm.

## Facts and Procedural History

[3] H.L.R. ("Proposed Guardian") was, for a time, married to Brothers' maternal grandmother, K.R. ("Grandmother"). Their marriage was dissolved in 2014. At that time, Brothers and their sister Ja.J. (together, "the Children"), all minors, were living with their biological father, J.R.J., Sr. ("Father") and his wife ("Stepmother"). In 2011, Father had been awarded legal custody of the

Children, when Ja.J was five years old, Je.J. was two, and Ju.J. was one.[2] Their biological mother S.W. ("Mother") abused drugs and was only sporadically in their lives. At all relevant times, Proposed Guardian lived near Father's residence, and he saw the Children on a regular basis, such as on weekends and attending their extracurricular activities and events, as well as holidays and birthdays.

[4] Father was engaged in dealing drugs, including in his home and in the Children's presence. In early April 2014, Stepmother ingested methamphetamine that Father had given her, was hospitalized, and died. The Indiana Department of Child Services ("DCS") removed the Children from Father's home on April 10, 2014 on allegations of illegal drug use and domestic battery. On April 11, 2014, Father was arrested on federal criminal drug charges; he has been continuously incarcerated since his arrest.

[5] DCS filed a child in need of services ("CHINS") petition for each of the Children, and they were placed for some months with Mother's sister, and then due to her family obligations, the Children were placed with a foster family. In January 2015, the trial court adjudicated the Children as CHINS, and, in February 2015, it issued a dispositional order and parenting participation order. By June 2015, the trial court changed the permanency plan from reunification to termination of parental rights. In 2015, the Children exercised some visits

---

[2] Ja.J. was born in August 2004, Je.J. was born in April 2007, and Ju.J. was born in July 2008.

with Mother, although she would relapse and disappear for periods of time. In January 2016, Mother died. In March 2016, Father was found guilty after a federal jury trial of Conspiracy to Distribute 300 Grams or More of Methamphetamine (Causing Death) and Distribution of Methamphetamine (Causing Death). Father received two concurrent life sentences for the convictions.[3]

[6]    On February 1, 2016, DCS filed a petition for termination of Father's parental rights. At that time, the Children were still with the foster family where they had originally been placed, and they remained there throughout the CHINS and termination proceedings. The Children exercised some visits with Proposed Guardian on weekends at times that he coordinated with the foster mother; Ja.J. participated in those for a short time, but then quit going for visitation with Proposed Guardian.

[7]    On August 8, 2016, the Proposed Guardian, who was the Children's ex-step-grandfather, filed three petitions for guardianship, one for each of the three Children, and Father consented to the guardianship. DCS filed a motion to intervene, which the trial court granted. The trial court held a consolidated hearing on DCS's termination of parental rights petitions and on Proposed Guardian's petitions for guardianship of the Children. The hearing began on

---

[3] Father's appeal of his convictions and sentence was pending at the time of the termination hearing in February and April 2017; however, the Seventh Circuit Court of Appeals affirmed his convictions and sentence on August 4, 2017. *United States v. Maggard*, 865 F.3d 960 (7th Cir. 2017).

February 17, 2017, and, due to time constraints, was concluded on April 11, 2017.

[8] At the hearing, Father acknowledged that the Children had suffered trauma in their lives and that they needed a permanent home, but he preferred that the Children be placed in guardianship with Proposed Guardian, rather than terminate his parental rights. *Tr. Vol. II* at 35. Father testified that Proposed Guardian had "always been a sense of security" in the Children's lives and that his home was "right down the street" from Father's. *Id*. at 28, 36. About the Proposed Guardian, Father said, "[the Children] love him." *Id*. at 35. Father did not want the Children to feel that he had abandoned them and wanted to be able to communicate with them, which Proposed Guardian had indicated Father could do if he were to receive guardianship of the Children.

[9] Among others, DCS called as witnesses Sherry Moore ("Moore"), who was the Children's therapist at Life Springs, and Melanie Young ("Young"), who was the Children's case manager at Life Springs. Moore began seeing the Children in November 2014. When she first saw them, they had "[a] lot of trauma which presented with anger. They would shut down a lot. [Ja.J] especially was angry." *Id*. at 49. She elaborated:

> Their trauma was considered chronic because of the exposure to drugs, witnessing drug use, witnessing people in and out of the house, seeing you know drugs being sold, the death of their stepmother was another issue that they were dealing with, incarceration of their father, removal of the home, they had two

placements — they were with their aunt, then they went into foster care[.]

*Id*. Moore also noted that their foster father died from cancer sometime in 2016. Moore testified that Ja.J. still experienced anxiety, worrying about what was going to happen to her and her brothers, and that because she was the caregiver for her brothers for so long, she struggled with being a sister and not a mother. Moore said that Ja.J. had indicated "on numerous occasions" that she wanted a home "with a mom and a dad," so that she could be a kid like others her age and not a mother. *Id*. at 55. The brothers had been diagnosed with ADHD and oppositional defiant disorder, which includes aggression and inability to regulate emotions. Moore stated that Je.J. internalizes everything and had made less progress because "he holds everything in." *Id*. at 51. Ju.J. also has reactive attachment disorder, caused by not having his needs met when he was younger, so he experienced difficulty getting along with people in social situations and had been hospitalized on four occasions due to outbursts and behavior issues. *Id*. at 52.

[10] Moore said that Proposed Guardian had participated in some of the Children's therapy sessions, but that Ja.J. did not always want to be in the session if he was there, and Ja.J. refused to go to his house for visits. Ja.J. expressed to Moore that returning to the same county, school, and area where she lived with Father would be "re-traumatizing to her all over again." *Id*. at 56. Moore was aware that DCS had identified a possible adoptive family, consisting of a mother and father and children, and that the Children had told her that they

"loved going over there" and "wish[ed] they could be adopted by that family." *Id*. at 58.

[11] Young, in her job as a case manager at Life Springs, helped to teach social skills and coping skills. She provided services to the Children in school and out of school, in the community, to work on social skills and getting along with others, giving prompts to the Children to avoid getting into physical or verbal altercations with peers or teachers. She began working with Ju.J. in November 2014 and with Ja.J. and Je.J. in July 2015. She said Ja.J. was doing well and that Je.J. was struggling, but had improved. Young shared that Ju.J. was "back to full days at school," as he had been only attending partial days due to disruptive behaviors in the classroom. *Id*. at 63. She testified, "They absolutely need to continue services," having made gains but requiring continued reinforcement. *Id*.

[12] Although Young had not been present at any visits between Brothers and Proposed Guardian, she indicated that she had concerns about placing the Children with him due to the fact that there would not be a mother in the house, stating that both Ja.J., as well as Brothers, "need a strong female role model" in the house. *Id*. at 64. Moore was aware of a possible family that might be interesting in adopting the Children and that the Children had visited with the family.

[13] DCS family case manager Debra Scatterfield ("FCM Scatterfield") also testified. She became involved in the case in May 2014, after the initial removal

and assessment, and was the family case manager on the case until August or September 2015, when family case manager Ryan Matern ("FCM Matern") took over the case, but FCM Scatterfield remained on the case as his supervisor. FCM Scatterfield described the Children's emotional, mental, and behavioral issues when she was assigned to the case, their respective diagnoses, as well as their progress and current status. During her time as FCM on the case, Scatterfield arranged some visitations with Mother during 2015, until Mother passed away in January 2016. She said that Proposed Guardian did not have any visitations with the Children during her time as FCM. *Id.* at 47.

[14] FCM Matern, who assumed responsibility on the case in or around September 2015, also testified. He stated that Brothers had been having visits during weekends, generally for five hours or so, with Proposed Guardian for approximately a year, but that Ja.J. was not willing to participate in those visits. FCM Matern opined that termination, not the proposed guardianship, was in the Children's best interests because (1) Ja.J. did not want to visit with Proposed Guardian, and (2) DCS was concerned about having the Children return to the same area "where everything went down[,]" referring to the drug activity, arrest of their Father, and removal from his home. *Id.* at 72. DCS wanted the Children to have a "fresh start in a different place or with a new family." *Id.*

[15] After DCS rested its case, Proposed Guardian and Grandmother testified. Proposed Guardian was then fifty-one years old, was steadily employed for seventeen or eighteen years, lived alone, and had no criminal convictions.

Proposed Guardian testified that, for approximately a year, he had been having visits during most weekends for five hours or so with Brothers and that there had been no problems. Proposed Guardian indicated that his visits with Ja.J. "stopped a good while back," but he said he did not know why, stating, "I have no idea, she doesn't act like the same [Ja.J.]." *Id.* at 84, 89. He presented pictures of his home and a van he purchased so that he could easily transport the Children. Proposed Guardian testified to attending the Children's activities and sporting events. He said that, if he were to be awarded guardianship, he would want the Children to stay in the same school that they were currently attending, although he currently did not reside or work in that county. Proposed Guardian stated that, if he were to be awarded guardianship, he would move his residence to the county where the Children were attending school. When asked who would care for the Children while he was at work, third shift, he stated that Grandmother would babysit them while he was at work, although she too lived in a different county from where the Children were then attending school, and that he might seek to change from working third shift.

Grandmother testified that she would, if asked, be willing to babysit for the Children at Proposed Guardian's home, if he were awarded guardianship of them. Grandmother had gone to Proposed Guardian's home on some occasions to visit with Brothers when they were at his home. She said that Ja.J. had come for a few visits, but then stopped visiting, although she did not know the reason why Ja.J. did not want to participate in visits with Proposed

Guardian. When asked if she had any concerns with the proposed guardianship, Grandmother said, "Yeah I do[,]" stating that sometimes there is yelling and arguing at Proposed Guardian's home, which sometimes is between her and Proposed Guardian, but sometimes Brothers get into it as well. *Id.* at 97-98. She opined, "[T]hey've been around enough of the yelling and arguing" and "I don't think they need to be associated with any of that." *Id.* at 99. Grandmother testified that in her opinion the three Children "should stay together" and not be separated through any guardianship or adoption. *Id.* at 100, 102.

[17] The trial court asked the parties to submit proposed findings and conclusions as to the termination and guardianship, and it took the matter under advisement. On May 15, 2017, it issued its Order[4] Denying Petition for Appointment of Guardian Over Minors ("Order").[5] Proposed Guardian now appeals the trial court's refusal to appoint him as guardian for Brothers, Je.J. and Ju.J.

## Discussion and Decision

[18] In this case, where Father had received two concurrent life sentences and Mother was deceased, the trial court was presented with competing options for

---

[4] We note that the juvenile court issued a separate order for each of the three Petitions, but because the orders are identical other than the child's name in the caption, we will, for ease and clarity, refer to the three orders collectively as one "Order."

[5] On May 18, 2017, the juvenile court issued an Order Terminating Parental Rights of Father, and Father appealed. This court will address Father's appeal of the termination of his parental rights by separate decision.

the Children's placement: (1) terminate Father's parental rights, allowing DCS to move forward with adoption; or (2) grant Proposed Guardian's request for guardianship of the Children. In Indiana, any person may file a petition for the appointment of a guardian for an incapacitated person or a minor. Ind. Code § 29-3-5-1(a). Indiana Code section 29-3-5-3, concerning appointment of a guardian, provides in relevant part:

> (a) Except under subsection (c), if it is alleged and the court finds that:
>
>> (1) The individual for whom the guardian is sought is an incapacitated person or a minor; and
>>
>> (2) The appointment of a guardian is necessary as a means of providing care and supervision of the physical person or property of the incapacitated person or minor;
>
> The court shall appoint a guardian under this chapter.
>
> . . . .
>
> (c) If the court finds that it is not in the best interests of the incapacitated person or minor to appoint a guardian, the court may:
>
> . . . .
>
>> (2) enter any other appropriate order; or
>>
>> (3) dismiss the proceedings.

The court is to give due regard to, among other things, the best interest of the child. Ind. Code §§ 29-3-5-3(c), 29-3-5-4(8).

[19] After a two-day hearing and taking the matter under advisement, the trial court denied Proposed Guardian's petitions for guardianship of the Children. Generally speaking, all guardianship findings, orders, and proceedings are committed to the sound discretion of the trial court. Ind. Code § 29-3-2-4(a). We therefore review guardianship decisions for an abuse of discretion, which occurs if the decision is against the logic and effect of the facts and circumstances before the court or if the court has misinterpreted the law. *In re Guardianship of N.R.*, 26 N.E.3d 97, 100 (Ind. Ct. App. 2015). Where, as here, the trial court did not enter specific findings of fact, a general judgment standard applies. *In re B.J.N.,* 19 N.E.3d 765, 769 (Ind. Ct. App. 2014). We may affirm a general judgment on any theory supported by the evidence at trial. *Id.* Because Proposed Guardian had the burden of proof at trial, he is appealing from a negative judgment. A party appealing from a negative judgment must show that the evidence points unerringly to a conclusion opposite that reached by the trial court. *In re. J.C.*, 735 N.E.2d 848, 849 (Ind. Ct. App. 2000). We will reverse a negative judgment only where the trial court's decision is contrary to law. *Indiana Dep't of Child Servs. v. J.D.*, 77 N.E.3d 801, 806 (Ind. Ct. App. 2017), *trans. denied.* In determining whether a negative judgment is contrary to law, we neither reweigh the evidence nor judge the credibility of witnesses, and consider only the evidence most favorable to the prevailing party, together with all reasonable inferences flowing therefrom. *J.C.,* 735 N.E.2d at 849.

[20] On appeal, Proposed Guardian readily acknowledges the numerous traumas that Brothers, indeed all three of the Children, have suffered, including witnessing the sale and use of drugs, removal from their home, Stepmother's death, Father's life sentences of federal incarceration, DCS placements with a maternal aunt and then a foster family, Mother's death, and the death of their foster father. Proposed Guardian argues that, while DCS believes that the best interests of Brothers would be served "by resetting their lives," it would be a disservice to Brothers, and not in their best interests, to try to erase the boys' "relationship and bond with their ex-step-grandfather and their grandmother." *Appellant's Br*. at 9. Proposed Guardian urges that he has been involved in their lives since birth and has been a source of stability, and, moreover, placement with him would allow Brothers to visit Grandmother. A guardianship, he argues, would thus retain "the remainder of the family bonds" and is preferable to adoption by a family who is unfamiliar to Brothers. *Id*. at 13.

[21] The trial court heard and considered Proposed Guardian's testimony concerning his continuing bond with Brothers, his home, his steady employment, his lack of criminal history, and his willingness to move his residence if he received guardianship. In addition, the trial court was presented with DCS's evidence that these particular Children need placement in a home with a mother and a father, that the three Children get along well with each other and share a bond, and that Ja.J. has anxiety about what is going to happen to her and her brothers. Moore testified that, at least as to Ja.J., going back to the same neighborhood where they lived with Father and witnessed

drug sales and abuse would be re-traumatizing. Proposed Guardian had been having visits with Brothers for the year or so preceding the hearing, but Ja.J. was unwilling to join for those visits, and she also would not participate in therapy if Proposed Guardian was present. Father testified that Proposed Guardian would allow Father to communicate with the Children, but evidence was presented that the Children rarely speak of Father and have not responded to his letters. FCM Matern testified that he was aware of the proposed guardianship, but that, in his opinion, termination and adoption, was in the Children's best interests. Grandmother felt that the three Children should stay together, and not be separated, and she acknowledged that she had concerns about the Children being placed with Proposed Guardian due to arguing occurring between him and her, in which Brothers sometimes became involved.

[22] The trial court heard and considered the evidence, judged the credibility of the witnesses, and determined that the best interests of the Children was termination of parental rights, and not guardianship. Given the record before us, and our deferential standard of review, we cannot say that the evidence points unerringly to a conclusion opposite that reached by the trial court. The trial court's decision to deny Proposed Guardian's petitions for appointment of guardianship of Je.J. and Ju.J was not contrary to law.

[23] Affirmed.

Najam, J., and Brown, J., concur.