FILED

Feb 11 2026, 9:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



IN THE

# Court of Appeals of Indiana

In the Matter of V.H.,
A Child Alleged to be in Need of Services

K.W. (Mother),

*Appellant-Respondent*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

---

February 11, 2026

Court of Appeals Case No.
25A-JC-1805

Appeal from the La Porte Circuit Court

The Honorable Erika Stallworth, Magistrate

Trial Court Cause No.
46C01-2502-JC-36

---

**Vaidik, Judge.**

## Case Summary

[1] When the Department of Child Services (DCS) alleges that a child is a child in need of services (CHINS), it generally must prove the allegations by a preponderance of the evidence. But in cases where a child has injuries suggesting neglect or abuse, the Presumption Statute, Indiana Code section 31-34-12-4, enables DCS to raise a rebuttable presumption that the child is a CHINS because of an act or omission of the child's parent, guardian, or custodian. To raise the presumption, DCS must show that the child's parent, guardian, or custodian had (or had legal responsibility for) the care, custody, or control of the child at the time the child was injured; the injury wouldn't ordinarily be sustained except for the act or omission of a parent, guardian, or custodian; and there is a reasonable probability that the injury wasn't accidental. Once DCS makes these showings, the burden shifts to the parent, guardian, or custodian to rebut the presumption that the child is a CHINS.

[2] After finding that DCS raised the presumption that V.H. ("Child") is a CHINS and that Child's parents failed to rebut the presumption, the trial court adjudicated Child to be a CHINS. K.W. ("Mother") now appeals, arguing that the trial court erred in allowing certain testimony at the fact-finding hearing and

that there is insufficient evidence to support the CHINS adjudication because the evidence doesn't show that she abused or neglected Child. But the Presumption Statute doesn't require DCS to prove that a parent abused or neglected their child. To raise the rebuttable presumption that a child is a CHINS because of an act or omission of their parent, guardian, or custodian, DCS need only produce competent evidence of probative value tending to establish the elements of the Presumption Statute. DCS did so here. Because Mother failed to rebut the presumption, and because the trial court didn't err in allowing the challenged testimony, we affirm.

## Facts and Procedural History

[3] Mother and K.H. ("Father") (collectively, "Parents") are the parents of Child, who was born in December 2024. Parents lived together with Child, and Father had parenting time with his three other children at the home on Saturdays. Mother's mother ("Grandmother") babysat Child while Parents were at work. On January 28, 2025, Mother took Child to see nurse practitioner Meredith Krogh, who'd been treating Child since birth, because Child had been spitting up more than normal for several days. Nurse Practitioner Krogh diagnosed Child with gastroesophageal reflux disease, but Child exhibited no signs of any other illness or injuries.

[4] On February 3, Grandmother was watching seven-week-old Child and noticed that her left thigh was stiff and swollen. Mother left work and took Child to the hospital, where Grandmother later joined her. Emergency physician Dr.

Michael Westfall ordered an X-ray, which showed an acute fracture in Child's left femur. Believing the injury to have been caused by some sort of trauma, Dr. Westfall made a report of possible physical abuse to DCS. When DCS and Dr. Westfall asked Mother and Grandmother if they knew how Child was injured, "[t]hey both stated they ha[d] no idea." Tr. p. 10. Due to Child's age and the lack of an explanation for her injury, she was transferred to Riley Hospital for Children for further treatment.

[5] The Child Protection Team at Riley performed additional diagnostic testing and imaging. The results confirmed Child's acute left femur fracture and also revealed a left tibia and fibula corner fracture, an acute left humerus fracture, a thin subdural hematoma, a possible retroperitoneal hematoma in her abdomen, soft-tissue swelling on her scalp, and healing posterior left rib fractures. Child's test results and physical examination revealed no health issues or conditions that would make her more susceptible to these injuries. Because some of the injuries were acute while others were healing, the Riley team was concerned that Child may have been injured on multiple occasions.

[6] Although Mother initially said she had "no idea" how Child's injuries occurred, she later reported that an eight-to-ten-pound dog had jumped on Child on February 1. Given the extent and varied healing stages of Child's injuries, the Riley team didn't find this to be a plausible explanation. Parents later disclosed that, also on February 1, they'd left Child alone with Father's seven-year-old child for three to five minutes while they carried groceries into the house. They suggested that the seven-year-old could've inflicted Child's injuries because that

child has "violent tendencies." *Id.* at 127. The Riley team also found this to be implausible because Child's injuries were sustained on at least two occasions, and a seven-year-old likely wouldn't be able to inflict the level of force needed to cause those injuries. The team concluded that Child's injuries "were inflicted injuries that coincide with physical abuse" and were "most consistent with non-accidental trauma." *Id.* at 11, 85. DCS removed Child and put her in relative placement, where she has since remained. Mother and Father were later charged with Level 3 felony domestic battery and Level 3 felony neglect of a dependent due to Child's injuries.[1]

[7] On February 6, DCS filed a petition alleging that Child is a CHINS. Parents denied the allegations, and the trial court set a fact-finding hearing for June 23. In preparation, Mother's attorney issued a subpoena duces tecum to nurse practitioner Barbara Beatty, a member of Riley's Child Protection Team who treated Child. The subpoena ordered Nurse Practitioner Beatty to produce for inspection or provide copies of (among other things) "[n]otes relied upon in treatment of [Child]" and "[d]ocuments in any form . . . resulting from, or relied upon in interviews, discussions, or conversations with any other employee of Riley Hospital for Children, any Law Enforcement Officer, or any DCS employee, in connection with the investigation of [Child.]" Appellant's App. Vol. 2 p. 76. Riley's legal department advised Mother's counsel that he needed to submit an affidavit stating that the records would only be used for

---

[1] Mother's criminal trial is set for May 2026. Trial has not yet been scheduled in Father's criminal case.

court proceedings. Counsel did so and then received a response to the subpoena, "but the response did not include any of the medical information, any of the images." Tr. p. 79.

[8] Nurse Practitioner Beatty testified as an expert at the fact-finding hearing. When she began describing the results of Child's imaging at Riley, Mother's counsel made a hearsay objection on the ground that Nurse Practitioner Beatty was referring to out-of-court statements in Child's medical records, specifically records that weren't provided in response to his subpoena. Counsel noted that without Child's imaging records, Mother's expert couldn't reach his own conclusions on what the imaging showed. DCS responded that, as an expert, Nurse Practitioner Beatty could rely on hearsay evidence in formulating her opinions. DCS added that Mother should've raised the production issue before the fact-finding hearing, not in the middle of it. The court overruled Mother's objection, finding that Nurse Practitioner Beatty qualified as an expert and therefore could base her opinions on the imaging.

[9] Nurse Practitioner Beatty testified that Child's injuries "would have been caused by some type of excessive force that, had it been seen by a reasonable caregiver, would have been noticed as excessive force." *Id.* at 89. She explained that a tibia and fibula corner fracture is usually caused by "a violent yank and twist of that extremity" and that posterior rib fractures are "highly concerning for non-accidental trauma," often "a squeezing of the chest or rib cage." *Id.* at 82, 87. While Child's subdural hematoma could've been birth-related, Nurse Practitioner Beatty noted that if it was, she'd expect it to be completely healed

after seven weeks. She opined that Parents' explanations that an eight-to-ten-pound dog or Father's seven-year-old child caused Child's injuries weren't plausible given the extent and various ages of the injuries.

[10] Dr. Westfall testified that it's "highly unlikely" that a fracture like the one in Child's left femur "happens under any other circumstance besides some trauma." *Id.* at 61. He explained that because children around six weeks old have minimal mobility, "the opportunity to invoke a trauma by the patient itself is highly unlikely." *Id.* at 62. Family Case Manager (FCM) Gabrielle Winslett testified that given the lack of any apparent injuries at Child's appointment with Nurse Practitioner Krogh on January 28, DCS concluded that Child likely sustained her acute injuries after that appointment. Based on the caregiving timeline Parents provided, FCM Winslett determined that from Child's January 28 appointment to her February 3 hospitalization, the only adults responsible for her care were Mother, Father, and Grandmother. FCM Winslett also noted that Father has a history of domestic violence including a conviction for battery against his ex-girlfriend.

[11] Dr. Stephen Guertin, a physician specializing in child abuse, testified as Mother's expert. Dr. Guertin opined that, based on the combination of Child's injuries and the various stages of healing, "this is an abused child." *Id.* at 175. But he noted that his opinion was limited because he was given only "a summary of what the findings were at Riley," not the imaging, lab results, or physician notes. *Id.* at 174. Dr. Guertin also testified that the biggest risk factor for child abuse is a history of domestic violence, and between 30 and 65% of

children living with someone who has committed domestic violence will be abused. Father didn't present any evidence of his own and, after all parties rested, admitted that Child is a CHINS. (Father doesn't participate in this appeal.)

[12] After the hearing, the trial court adjudicated Child to be a CHINS. The court also issued a dispositional order setting forth various requirements for Parents.

[13] Mother now appeals.

## Discussion and Decision

### I. The trial court did not abuse its discretion in allowing Nurse Practitioner Beatty's testimony

[14] Mother first argues that the trial court erred in allowing Nurse Practitioner Beatty to testify about the results of Child's imaging at Riley. We review a trial court's decision on the admission or exclusion of evidence for an abuse of discretion. *In re Des.B.*, 2 N.E.3d 828, 834 (Ind. Ct. App. 2014). A trial court abuses its discretion only if its decision is clearly against the logic and effect of the facts and circumstances before it. *Id.*

[15] The parties agree that Nurse Practitioner Beatty was an expert witness. Under Indiana Evidence Rule 703, "[e]xperts may testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field." Mother doesn't dispute that, as an expert, Nurse Practitioner Beatty was permitted to testify about otherwise inadmissible

hearsay evidence. But Mother argues that Nurse Practitioner Beatty shouldn't have been allowed to testify about what Child's imaging showed because she failed to produce the imaging records in response to Mother's subpoena, preventing Dr. Guertin from forming his own opinion on the records.[2]

[16] We aren't convinced by Mother's claim that Nurse Practitioner Beatty failed to comply with her subpoena. In arguing that Nurse Practitioner Beatty was required to produce Child's imaging records, Mother points to the following requests in her subpoena:

> 5. Notes relied upon in treatment of [Child];

> 6. Documents in any form whatsoever, including but not limited to meeting notes, emails, text messages, and voicemails, resulting from, or relied upon in interviews, discussions, or conversations with any other employee of Riley Hospital for Children, any Law Enforcement Officer, or any DCS employee, in connection with the investigation of [Child.]

Appellant's Br. pp. 24-25 (citing Appellant's App. Vol. 2 p. 76). While imaging records could conceivably fall within these requests, the subpoena by no means makes it clear that Nurse Practitioner Beatty was required to produce these

---

[2] On appeal, Mother claims that Nurse Practitioner Beatty's failure to produce Child's medical records and imaging deprived her of her "due process rights to confront and cross examine witnesses." Appellant's Br. p. 28. But Mother didn't raise a due-process argument in the trial court, so she has waived this claim for our review. *See In re N.G.*, 51 N.E.3d 1167, 1173 (Ind. 2016) ("[A] party on appeal may waive a constitutional claim, including a claimed violation of due process rights, by raising it for the first time on appeal.").

records. We can hardly say that the failure to do so constitutes a refusal to comply with the subpoena.

[17] In any event, DCS contends that if Mother believed Nurse Practitioner Beatty or Riley failed to produce requested records, she should've moved to compel production of the records or moved for a continuance instead of raising the issue in the middle of the fact-finding hearing. We agree. In making his objection, Mother's trial counsel stated that he "requested all notes, all documents, everything that was used to diagnose [Child]" and that he "exchanged emails . . . about th[e] subpoena" with Riley's legal department. Tr. p. 78. He explained that, after providing Riley with the requested affidavit, he "was given a response" to his subpoena, "but the response did not include any of the medical information, any of the images." *Id.* at 79. At that point, Mother could've moved to compel production of any records believed to be outstanding. *See* Ind. Trial Rule 37(A)(2) ("[I]f a party or witness . . . fails to respond that inspection will be permitted as requested or fails to permit inspection as requested, the discovering party may move for . . . an order compelling inspection in accordance with the request."). Mother's counsel further explained that he exchanged emails with "[a] vice president . . . of the legal [team] at IU [Health] to facilitate the exchange of that information." Tr. p. 79. Based on the minimal details counsel provided about the timing and contents of his email exchange(s) with Riley's legal department, it is unclear whether he made a more specific request via email for additional records after receiving the initial response to the subpoena. If Mother was awaiting an

additional response from Riley with the outstanding medical records, she should've moved to continue the fact-finding hearing until after she received the records and her expert could review them.

[18] We also note that, before the fact-finding hearing began, the trial court asked, "Are there any other motions before the Court before we get started?" *Id.* at 40. At that point, Mother should've alerted the trial court that requested medical records were outstanding and moved to preclude Nurse Practitioner Beatty from testifying about the missing records. But instead, Mother's counsel said nothing and waited to raise the issue until Nurse Practitioner Beatty had begun testifying. Until then, the trial court had no way of knowing that any records were outstanding or that Mother's expert hadn't been able to review them. Given the vague language in the subpoena, Mother's failure to raise the production issue at multiple points in the proceedings, and the fact that Rule 703 allows Nurse Practitioner Beatty to offer her expert opinion based on otherwise inadmissible evidence, the trial court did not abuse its discretion in allowing Nurse Practitioner Beatty to testify about Child's medical records.

## II. The trial court's CHINS adjudication was not clearly erroneous

[19] Mother also contends that there is insufficient evidence to support the CHINS adjudication. We will reverse a CHINS adjudication only upon a showing that the trial court's decision was clearly erroneous. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). We consider only the evidence that supports the decision and

all reasonable inferences that can be drawn therefrom, and we neither reweigh the evidence nor judge witness credibility. *Id.*

[20] There are three basic elements DCS must prove for a child to be adjudicated a CHINS: the child is under 18; one or more of the statutory circumstances outlined in Indiana Code sections 31-34-1-1 through -11 exists; and the care, treatment, or rehabilitation required to address those circumstances is unlikely to be provided or accepted without the coercive intervention of the court. *In re K.Y.*, 145 N.E.3d 854, 860 (Ind. Ct. App. 2020), *trans. denied*. Generally, DCS must prove these elements by a preponderance of the evidence. Ind. Code § 31-34-12-3. But when DCS invokes Indiana Code section 31-34-12-4 ("the Presumption Statute") in addition to its allegation(s) under Sections 31-34-1-1 through -11, it can raise a rebuttable presumption that the child is a CHINS because of an act or omission of the child's parent, guardian, or custodian and shift the burden of going forward with evidence to the parent, guardian, or custodian. *K.Y.*, 145 N.E.3d at 860-61.

[21] Here, DCS alleged, and the trial court found, that Child is a CHINS under Indiana Code sections 31-34-1-1 and 31-34-1-2. Under Section 31-34-1-1, a child is a CHINS if, before the child turns 18,

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision:

(A) when the parent, guardian, or custodian is financially able to do so; or

(B) due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

And, as alleged here, a child is a CHINS under Section 31-34-1-2 if, before the child turns 18,

(1) the child's physical or mental health is seriously endangered due to injury by the act or omission of the child's parent, guardian, or custodian; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

I.C. § 31-34-1-2(a) (2024).[3] DCS also invoked the Presumption Statute, which provides:

> A rebuttable presumption is raised that the child is a child in need of services because of an act or omission of the child's parent, guardian, or custodian if the state introduces competent evidence of probative value that:
>
> > (1) the child has been injured;
> >
> > (2) at the time the child was injured, the parent, guardian, or custodian:
> >
> > > (A) had the care, custody, or control of the child; or
> > >
> > > (B) had legal responsibility for the care, custody, or control of the child;
> >
> > (3) the injury would not ordinarily be sustained except for the act or omission of a parent, guardian, or custodian; and
> >
> > (4) there is a reasonable probability that the injury was not accidental.

[22]     "The purpose of the Presumption Statute is clear. In cases where a child has injuries that suggest neglect or abuse, it shifts the burden to the party most likely

---

[3] Section 31-34-1-2 was amended effective July 1, 2025, *see* Pub. L. No. 179-2025, § 11, after the CHINS adjudication but before Mother filed her Notice of Appeal. Neither party argues that this amendment has any bearing on the proceedings.

to have knowledge of the cause of the injuries—the parent, guardian, or custodian . . . ." *Ind. Dep't of Child Servs. v. J.D.*, 77 N.E.3d 801, 807 (Ind. Ct. App. 2017), *trans. denied*. Once DCS produces the requisite evidence, "the rebuttable presumption that a child is a CHINS applies to all the statutory CHINS elements in [Indiana Code chapter 31-34-1.]"[4] *K.Y.*, 145 N.E.3d at 861.

[23] In challenging the trial court's conclusion that the Presumption Statute applies, Mother's main argument is that the evidence is insufficient to show that she abused or neglected Child. But this argument imputes a burden to DCS beyond what the Presumption Statute requires. DCS isn't required to prove that a parent, guardian, or custodian did, in fact, cause the child's injury. *See In re C.B.*, 865 N.E.2d 1068, 1073 (Ind. Ct. App. 2007) ("While it is not certain whether Mother inflicted these injuries upon C.B., there is no question that C.B. suffered this harm while under Mother's care and custody."), *trans. denied*;

---

[4] After asserting that "[t]he trial court's conclusion that Child was a CHINS under the Presumption Statute was not clearly erroneous," DCS notes that the trial court also concluded that Child is a CHINS under Sections 31-34-1-1 and 31-34-1-2 and states that "Mother does not challenge those conclusions on appeal so she has waived these issues on appeal." Appellee's Br. p. 19. To the extent that DCS is suggesting that the Presumption Statute may serve as a standalone basis for a CHINS adjudication, this is incorrect. As explained above, the Presumption Statute is a provision that DCS can invoke alongside an allegation that a child is a CHINS under one or more of the statutory circumstances outlined in Indiana Code sections 31-34-1-1 through -11. Once DCS presents sufficient evidence to establish the elements of the Presumption Statute, the rebuttable presumption applies to each element of the CHINS statute(s) alleged. *See K.Y.*, 145 N.E.3d at 861 (citing *J.D.*, 77 N.E.3d at 809 n.3); *J.D.*, 77 N.E.3d at 809 n.3 ("[T]he presumption applies to all elements of I.C. § 31-34-1-2. In other words, there is a rebuttable presumption not only that Child's physical or mental health is endangered, but also that Child needs care, treatment, or rehabilitation that he is not receiving and is unlikely to be provided or accepted without the coercive intervention of the court."). If the trial court concludes that the child's parent, guardian, or custodian failed to rebut the presumption, the court will adjudicate the child to be a CHINS under the particular CHINS statute(s) alleged. *See, e.g., In re T.O.*, No. 25A-JC-1179, 2025 WL 2986036, at *3 (Ind. Ct. App. Oct. 23, 3025) (mem.) ("The juvenile court found that a rebuttable presumption was established that Child was a CHINS and adjudicated him to be so pursuant to Indiana Code sections 31-34-1-1 and 31-34-1-2.").

*In re R.G.*, 130 N.E.3d 1171, 1180 (Ind. Ct. App. 2019) (affirming trial court's conclusion that statutory presumption in Section 31-34-12-4 applied where pediatrician ruled out medical causes for child's injury and mother couldn't provide a plausible explanation), *trans. denied*. Rather, to shift the burden of production to the parent, guardian, or custodian, DCS need only produce "some relevant and admissible evidence tending to establish the elements of the Presumption Statute." *J.D.*, 77 N.E.3d at 809. DCS did so here.

[24] It is indisputable that Child was injured. At seven weeks old, she was found to have an acute left femur fracture, a left tibia and fibula corner fracture, an acute left humerus fracture, a thin subdural hematoma, a possible retroperitoneal hematoma, soft-tissue swelling on her scalp, and healing posterior left rib fractures. Because some of the injuries were newer while others were in various stages of healing, the Riley team concluded that Child was injured on at least two occasions. Although it's unknown when the injuries occurred, given the lack of any apparent injuries at Child's January 28 appointment with Nurse Practitioner Krogh, DCS concluded that Child likely sustained her acute injuries between that appointment and her February 3 hospitalization. FCM Winslett testified, and Mother doesn't dispute, that the only caregivers who had responsibility for Child during that time were Mother, Father, and Grandmother. And as the trial court found, "Mother and Father are legally responsible for the care and custody of [Child]." Appellant's App. Vol. 2 p. 112. This evidence establishes that Child was injured while in the care of a parent or while Parents had legal responsibility for her care and custody.

DCS also presented evidence that Child's injuries wouldn't ordinarily be sustained except for the act or omission of a parent, guardian, or custodian and that there is a reasonable probability that the injuries weren't accidental. Riley's Child Protection Team concluded that Child's injuries "were inflicted injuries that coincide with physical abuse" and were "most consistent with non-accidental trauma." Dr. Westfall explained that it's "highly unlikely" for a fracture like the one in Child's left femur to "happen[] under any other circumstance besides some trauma," and it's "highly unlikely" that children as young as Child could inflict trauma themselves because they have such limited mobility. Nurse Practitioner Beatty testified that Child's injuries "would have been caused by some type of excessive force" and that a reasonable caregiver who witnessed the injuries "would have . . . noticed" the force as excessive. She explained that a tibia and fibula corner fracture is usually caused by "a violent yank and twist" and that posterior rib fractures are "highly concerning for non-accidental trauma," often a "a squeezing of the chest or rib cage." This evidence was sufficient to raise the presumption that Child is a CHINS and shift the burden to Parents.

Mother contends that she presented sufficient evidence to rebut the presumption that Child is a CHINS. She relies primarily on Father's history of domestic violence and Dr. Guertin's testimony about the association between domestic violence and child abuse, claiming that "it is much more likely that Father abused or neglected [Child]." Appellant's Br. p. 34. But again, this argument goes beyond what the Presumption Statute requires. "[A] CHINS

adjudication is not a determination of parental fault"; rather, it "reflects the status of a child without establishing the culpability of a particular parent." *R.G.*, 130 N.E.3d at 1178 (citing *In re N.E.*, 919 N.E.2d 102, 106 (Ind. 2010)). In reviewing CHINS adjudications under Chapter 31-34-1, our appellate courts have found that "the conduct of one parent can be enough for a child to be adjudicated a CHINS." *See, e.g.*, *N.E.*, 919 N.E.2d at 106. This same conclusion applies when DCS invokes the Presumption Statute, which doesn't require DCS to prove which parent's act or omission may have led to the child's injury. Even if we accepted Mother's contention that Father more likely caused Child's injuries, this wouldn't rebut the presumption that Child is a CHINS because Child still would've been injured while in the care of a parent. *See J.D.*, 77 N.E.3d at 809 n.2 (rejecting Mother's argument that DCS failed to establish that Child was injured in her care because "the possibility that Child was injured while in Father's care would not affect the applicability of the Presumption Statute. There is no dispute that from the time of his birth until the discovery of his injuries, Child was at all times in the care and custody of a parent.") (citing *N.E.*, 919 N.E.2d at 106).

[27] Looking to the rest of the evidence, Parents failed to rebut the presumption that Child is a CHINS. At first, Mother said she had "no idea" how Child could've sustained her femur fracture. Then, once the rest of Child's injuries were discovered, Parents suggested that they could've been caused by an eight-to-ten-pound dog jumping on Child or by Father's seven-year-old who has "violent tendencies" and was alone with Child for three to five minutes. The Riley team

ruled out these explanations because Parents said both events occurred on February 1, but Child's injuries were sustained on at least two occasions, and a seven-year-old likely wouldn't be able to inflict the level of force needed to cause the injuries. Additionally, Child's physical examination and test results from Riley didn't indicate that she had any health issues or conditions that would make her more susceptible to these injuries. Nurse Practitioner Beatty noted that if Child's subdural hematoma had been birth-related, she'd expect it to be completely healed after seven weeks. And although he noted that his opinion was limited, Mother's own expert Dr. Guertin opined that Child "is an abused child." Because Parents failed to rebut the presumption, the trial court did not err in concluding that Child is a CHINS.

[28] Affirmed.

Mathias, J., and Pyle, J., concur.

ATTORNEY FOR APPELLANT

Jennifer L. Koethe
Wake Forest, North Carolina

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana