## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 28 2020, 10:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Isabella Bravo
Bloomington, Indiana

ATTORNEYS FOR APPELLEE:

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of S.S., N.S., and M.S., (Minor Children), Children in Need of Services,

and

V.S. (Mother),
*Appellant-Respondent,*

v.

The Indiana Department of Child Services,
*Appellee-Petitioner.*

February 28, 2020

Court of Appeals Case No.
19A-JC-2107

Appeal from the Monroe Circuit Court

The Honorable Stephen R. Galvin, Judge

Trial Court Cause No.
53C07-1905-JC-251
53C07-1905-JC-252
53C07-1905-JC-253

**Tavitas, Judge.**

## Case Summary

V.S. ("Mother") appeals the trial court's order adjudicating Mother's three minor children, S.S., N.S., and M.S. (the "Children") as children in need of services ("CHINS"). We affirm

## Issues

Mother raises two issues on appeal, which we revise and restate as:

    I.    Whether the evidence was sufficient to support the trial court's conclusion that coercive intervention of the court was necessary.

    II.    Whether the trial court abused its discretion in ordering Mother to participate in a psychological evaluation in the dispositional decree.

## Facts

Mother has three children: S.S., born April 2010; N.S., born December 2012; and M.S., born July 2018. A.S. is the father of S.S.; A.W. is the father of N.S.; and J.J is the father of M.S.[1]

In early 2019, Mother requested assistance from Community Partners to support Mother because she was caring for a newborn and her older two

---

[1] Mother only appeals the finding that the Children are CHINS. At the fact finding hearing, A.W. and J.J. failed to appear, but their attorneys were present, and A.S. initially appeared by telephone and A.S.'s lawyer was present in person.

children had some "behavioral issues."[2] Tr. Vol. II p. 86. On January 27, 2019, Mother began working with Allysha Ringer, a home based case worker at Ireland Home Based Services ("Ireland"), on parenting education and resourcing.

[5] Around March 12, Mother told Ringer she had issues with the home, including bed bugs[3] and black mold. Ringer observed that the Children's hair was unkept and that, at times, the Children had "certain odors" related to poor hygiene. *Id.* at 91. S.S.'s school also noted S.S.'s poor hygiene. Mother disclosed to Ringer that S.S. had previously been sexually assaulted. Mother was also looking for assistance with paying for rent and utilities because her mother ("Grandmother") was currently paying those bills.

[6] As best we can ascertain from the record, the following events occurred in April 2019 as follows. In early April, Mother and Ringer discussed that a friend would begin watching M.S. while Mother was at work. The friend, Mother said, did "some illegal things" and had a "trap house"; however, according to Mother, M.S. would be safe "because [M.S. wouldn't be] anywhere near any drugs." *Id.* at 89. Ringer advised against this plan for M.S. Mother also told Ringer she was "jumped" and had to take M.S. to the emergency room because she had to throw M.S. on the couch during the attack. *Id.* According to

---

[2] Mother was working with a mental health professional since 2012 after the birth of N.S.

[3] Mother was able to remedy the bed bug situation in the home.

Mother, M.S.'s injuries resulted in "water" on the "skull or the brain" and slight bruising. *Id.*

[7] Mother had a contentious relationship with her then-boyfriend, D.L. In early April, S.S. called police after D.L. beat down a door to reach Mother. Mother told Ringer that she "passed out in the bathroom," and D.L. was trying to help Mother. *Id.* at 90.

[8] Later in April, family case manager ("FCM") Rebecca Geiselman began working on Mother's case after she received a report regarding domestic violence and substance abuse issues in the home while the Children were present.[4] Mother told FCM Geiselman that D.L. would not be allowed near the Children unless he "had proven some sobriety" and "taken anger management classes." *Id.* at 39. FCM Geiselman also observed marks on Mother's body.

[9] Mother informed FCM Geiselman that the Children were home during the arguments with D.L., and while they did not witness the fights, they saw the "aftermath," such as a broken bathroom door and holes in the wall. *Id.* at 40. FCM Geiselman created a safety plan with Mother, which precluded D.L. from being around the children. FCM Geiselman was later notified that D.L. was hiding in the closet at Mother's home while Mother was agreeing to the safety

---

[4] It appears that Mother's voluntary services with Ringer and Mother's time with DCS on her case overlapped in April. Mother's services with Ringer ended on April 24.

plan with FCM Geiselman. Mother stated to FCM Geiselman that she was going to seek an order for protection against D.L.; however, the next day, Mother called FCM Geiselman from the court clerk's office because Mother did not want to get the order for protection. Mother stated she only considered obtaining the order for protection "in order to satisfy DCS'[s] request."[5] *Id.* at 93.

[10] On April 21 and 22, Mother also complained to FCM Geiselman regarding her relationship with Mother. Mother told FCM Geiselman that Grandmother caused bruises on Mother's wrist.

[11] Around the same time, on April 24, Mother and D.L. "got into a physical altercation," and N.S. contacted the police. Mother told FCM Geiselman that Mother no longer wanted a relationship with D.L., that she wanted to move out of Indiana, that her electricity was shut off, and her vehicle was repossessed.

[12] Mother's issues in May 2019 were similar. On May 3, S.S. was suspended from school for "drawing homicidal and suicidal statements and pictures" at school. *Id.* at 47. On May 7, Mother married D.L. "so that he could be on her Section 8 housing and not be kicked out of her home." *Id.* at 49. Mother admitted to FCM Geiselman that "she knew it wasn't the best idea" to marry D.L., but

---

[5] Mother agreed, instead of filing an order for protection, to meet with FCM Geiselman regarding an informal adjustment. Mother and D.L. did meet with FCM Geiselman and signed the informal adjustment, but "it was not formally filed or ordered." Tr. Vol. II p. 43.

"she didn't want him to be on the streets." *Id.* at 50. Mother and D.L. agreed D.L. would not be around the children unsupervised.

[13] On May 10, FCM Geiselman met with Mother, and Mother reported that she was attacked by a group of men, which included A.W.'s friends, while she was taking methamphetamine to a motel for A.W. Mother delivered methamphetamine for A.W. because Mother's electricity was shut off and she needed money to feed the children, especially in light of M.S.'s special milk needs due to gastrointestinal issues. Mother reported that her clothes were ripped off and found Mother was wearing little clothing and was wrapped in a blanket. Grandmother believed that Mother was impaired that night.

[14] After this incident, on or around May 10, Mother told FCM Geiselman that she did not feel safe in her home, especially around D.L. or Grandmother; therefore, FCM Geiselman arranged to take Mother to Middle Way House. Mother initially agreed; however, Mother eventually changed her mind and said that she only initially agreed "because that's what DCS wanted." *Id.* at 54. Mother had no place to go and did not have money to pay for a hotel. Mother could not formulate a safety plan for the Children; therefore, FCM Geiselman detained the Children.

[15] When D.L. returned home while FCM Geiselman was detaining the Children, Mother and D.L. began yelling at one another, and D.L. punched a tree and a mailbox and ripped off his shirt in anger. FCM Geiselman described the behavior as "[e]rratic, aggressive, [and] scary." *Id.* at 55.

[16]     On May 13, 2019, DCS filed a request to detain the Children. A short time later, Mother told FCM Geiselman that Mother intended to get an order for protection, she wanted to get the marriage annulled, and she wanted to get away from both D.L. and Grandmother.[6]

[17]     The trial court granted DCS's request to detain the Children on May 16, 2019. On May 15, 2019, DCS filed a petition alleging the Children are CHINS. The petition alleged that: Mother struggled with domestic violence and substance abuse; Mother has broken safety plans with regard to the Children; Mother has a history of mental health disorders; Mother is unemployed and financial unstable; and that Mother's current husband, D.L., has been allowed to remain in the home with the Children despite D.L.'s violence towards Mother.

[18]     Mother began working with Brianna Underhill, a therapist at Centerstone, in June 2019 after a referral by DCS. Mother's diagnosis at the time of intake with Underhill was major depressive disorder and sedative use disorder; however, Underhill also believed Mother suffered from borderline personality disorder. Mother told Underhill that she struggled with anger; was taking more of her Adderall than what was prescribed; and was taking benzodiazepine several days before her intake session. Mother also recounted to Underhill an

---

[6] As discussed below by Officer Shrake, it appears Mother did get the order for protection; however, it also appears Mother subsequently requested that order for protection dismissed. FCM Geiselman was uncertain if Mother ever obtained the order for protection at this time.

occasion where D.L. grabbed a backpack on Mother's back, pulled Mother backwards and caused Mother to fall during an argument.

[19] On June 17, 2019, the trial court held a fact finding hearing regarding the CHINS petition. At the fact finding hearing, Mother testified that the violence between her and D.L. was not physical but "more emotional . . . like screaming and yelling," and that D.L. would "hit walls or the furniture or something." Tr. Vol. II p. 10. Mother also testified that she completed another behavioral assessment but that she was not told her diagnosis. At the time of the fact finding hearing, Mother was living with Grandmother.

[20] Mother also testified that she has been participating in voluntary services because Mother was "tired of people thinking [she was] not doing anything for [her] kids." Tr. Vol. II pp. 16-17. Mother testified she was not selling drugs for A.W.

[21] Mother testified she told FCM Geiselman she would go anywhere other than Middle Way House, but instead, FCM Geiselman just "took away the kids." *Id.* at 162. Finally, Mother testified that her court date for her divorce with D.L. was scheduled for July 15.

[22] Maria Corrosco-Williams, with Monroe County Community School Corporation at Templeton, testified that she spoke with Mother regarding behavioral issues with N.S. and S.S. Specifically, Corrosco-Williams testified that S.S. discussed harming herself and others, and that Corrosco-Williams specifically discussed with Mother the issue regarding S.S.'s notes and

drawings; on one occasion S.S. was swallowing push-pins at school. S.S. was sent home twice in four months due to behavioral concerns. S.S. also attended school without shoes one day in January 2019, after Mother contends S.S. hid her shoes and could not find the shoes.

[23] Mother testified that S.S. drew the pictures at school because her therapist told her to use her words and S.S. has a problem "expressing her emotions." Tr. Vol. II p. 22. Mother also testified that she has been working on a resolution to stop S.S. from chewing push pins. According to Mother, S.S. has been seeing service providers to assist her with these issues.

[24] During a break in the fact finding hearing, Mother asked Grandmother not to testify. Grandmother, however, testified that Mother reported that A.W. and D.L. both forced Mother to take drugs in the past.

[25] In May, Officer Rob Shrake, with the Bloomington Police Department, was tasked with investigating a fire at Mother's home. Although the investigation was ongoing, Officer Shrake testified that officers found a fire was "set" in the home; Mother did not always cooperate with investigating officers. *Id.* at 35. Officer Shrake also discovered in his investigation that, according to Mother, Mother stated she "did get a protective order"; however, upon Officer Shrake following up with the court clerk's office, the office informed Officer Shrake the protective order was dismissed because Mother "withdrew her request." *Id.* at 37.

On July 19, 2019, the trial court entered an order finding the Children were CHINS. Relevant to Mother's appeal, the trial court concluded:

> [Mother] has engaged in repeated incidents of domestic violence with her boyfriend, [D.L.], in the presence of the children. The children have been forced to call the police to protect their mother. [Mother] has subsequently lied about the nature of these altercations. She has refused assistance in protecting herself and her children from [D.L.]. She married [D.L.]. [Mother] sells controlled substances for [A.W.] and abuses controlled substances. She has been diagnosed with Sedative Use Disorder. [Mother] does not believe that she needs substance abuse treatment. [Mother] admits that [M.S.] was injured during an altercation in her home. [Mother] sent [S.S.] to school without shoes in January, 2019. [S.S.] suffers from emotional and behavioral problems. [S.S.] has threatened to commit suicide and to harm others. It is reasonable to infer that the domestic violence in [S.S.'s] home and her mother's ongoing substance abuse are having a negative impact on the child. None of the fathers are able and willing to care for their children. Clearly, the coercive intervention of the Court is necessary to ensure the health and safety of [S.S.], [N.S.], and [M.S.].

Appellant's App. Vol. II p. 36.

At the dispositional hearing, Mother's attorney questioned witnesses regarding Mother's compliance with her individual therapy. Mother also testified that she meets with her therapist bi-weekly. Mother's counsel argued that, although DCS has requested a psychological evaluation, Mother already completed a psychological evaluation, as discussed at the CHINS fact finding hearing. DCS countered that the prior evaluation was not a psychological evaluation and that Centerstone, Mother's new provider, would request a psychological evaluation.

The CASA stated that she believed Mother should have a psychological evaluation based on Mother's "mental issues, [and] substance abuse issues." *Id.* at 193. The CASA also testified that the "psych eval is more in depth" than the evaluation Mother had prior to the CHINS fact finding hearing. *Id.* at 194. Still, Mother objected to the psychological evaluation, arguing that the CASA and DCS did not provide evidence to create "a basis either in [Mother's] failure to comply with services or the service provider recommending a psychological evaluation." *Id.* at 195.

[28] The trial court stated, at the hearing, that it "believe[d] that a psychological evaluation, independent of whether or not DCS believes it is necessary . . . is necessary based on the findings of fact in this case." *Id.* at 196. The trial court entered a dispositional order on August 12, 2019, which ordered the Children to remain in their placement and required Mother, in part, to: complete a substance abuse assessment and complete the recommendations at a 95% compliance rate; submit to weekly random drug screening; participate in services; maintain contact with the FCM; maintain stable and safe housing; maintain stable and legal employment; avoid committing acts of domestic violence; have any persons responsible for the Children approved by the FCM; participate in a parenting assessment; and participate in a psychological evaluation and complete the recommendations at a 95% compliance rate. Mother now appeals.

## Analysis

### I. Sufficiency of the Evidence

[29] Mother argues the evidence is insufficient to conclude that the Children are CHINS. CHINS proceedings are civil actions; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *N.L. v. Ind. Dep't of Child Servs* (*In re N.E.*), 919 N.E.2d 102, 106 (Ind. 2010). On review, we neither reweigh the evidence nor judge the credibility of the witnesses. *Id.* Here, the trial court entered findings of fact and conclusions thereon in granting DCS's CHINS petitions. When reviewing findings of fact and conclusions thereon, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *In re I.A.,* 934 N.E.2d 1127, 1132 (Ind. 2010). We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[30] Indiana Code Section 31-34-1-1 provides that:

> . . . [A] child is a child in need of services if, before the child becomes eighteen years of age:
>
> > (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food,

clothing, shelter, medical care, education, or supervision;
and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without
the coercive intervention of the court.

[31]     "[T]he purpose of a CHINS adjudication is to protect children, not [to] punish parents." *In re N.E.*, 919 N.E.2d at 106. A CHINS adjudication is not a determination of parental fault but rather is a determination that a child is in need of services and is unlikely to receive those services without intervention of the court. *Id.* at 105. "A CHINS adjudication focuses on the condition of the child . . . . [T]he acts or omissions of one parent can cause a condition that creates the need for court intervention." *Id.* (citations omitted).

[32]     Mother's specific argument is that DCS failed to prove that Mother will only meet the Children's needs with the coercive intervention of the trial court. Indiana Code Section 31-34-1-1(2), as described above, "guards against unwarranted State interference in family life, reserving that intrusion for families 'where parents lack the *ability* to provide for their children,' not merely where they 'encounter *difficulty* in meeting a child's needs.'" *In re D.J. v. Indiana Dept. of Child Services,* 68 N.E.3d 574, 580 (Ind. 2017) (quoting *In re S.D.,* 2 N.E.3d 1283, 1287 (Ind. 2014)) (emphasis supplied). When considering this requirement, "courts should consider the family's condition not just when the

case was filed, but also when it is heard." *D.J.*, 68 N.E.3d at 580 (quotations omitted). "Doing so avoids punishing parents for past mistakes when they have already corrected them." *Id.* at 581.

[33] Mother argues court intervention was not necessary because: (1) she initiated services to help with the Children's needs; (2) she was in the process of divorcing D.L. and, thus, the Children no longer need to be protected from domestic violence; (3) Mother was getting help for her substance abuse issues, and she only delivered illegal substances once for A.W.; and (4) Mother was taking care of the Children's basic needs.[7]

[34] Mother's assertions are nothing more than a request for us to reweigh the evidence, which we cannot do. While we commend Mother for taking a proactive step in getting assistance before DCS was involved in Mother's case, Mother has continually struggled to maintain a safe home and plan for the Children in the home.[8] Just over one month before the CHINS fact finding hearing, Mother married D.L. despite concerns regarding the Children's safety. Although Mother has said many times that she does not want to be in a

---

[7] Mother argues the Children's basic needs were demonstrated as met because: the conditions of Mother's home did not endanger the Children, Mother got appropriate housing on her own, Mother took the Children to receive their medical care, there was no evidence the Children did not have food, S.S. only went to school without shoes once and Mother was committed to S.S.'s education, Mother actively sought educational assistance, and there was no evidence that Mother allowed someone in a "trap house" to watch M.S. – only that she sought advice. Appellant's Br. p. 28.

[8] In her brief, Mother argues that the evidence does not support the trial court's finding that Mother was noncompliant with Ringer's and Mother's voluntary services. We disagree. At the CHINS fact finding hearing, Ringer testified: "[w]ith services, I would say during the course of services she didn't always complete the task that was given." Tr. Vol. II p. 91.

relationship with D.L., she has also changed her mind many times. Mother has identified, more than once, that it is not safe for the Children to be around D.L. Separately, M.S. suffered bruises and "water on the brain" from a violent altercation in which Mother was involved. Tr. Vol. II p. 89.

[35] While it appears that Mother has taken S.S. to some level of therapy to help her with issues that perhaps stem from an earlier sexual assault, Mother is seemingly dismissive of the harm that S.S. may cause to herself or others. After S.S. wrote notes in school discussing violent and suicidal thoughts, Mother wrote off the behavior as S.S. expressing herself in a way directed by her therapy.

[36] Based on all these facts, there was sufficient evidence to find coercive intervention of the court was required. It is not clearly erroneous for the trial court to conclude, based on Mother's history of conduct, including leading up to the CHINS fact finding hearing, that Mother needed the coercive intervention of the court to provide for the Children's safety.

## II. *Mother's Psychological Evaluation*

[37] Mother also contends that the trial court erred in requiring Mother, through the dispositional order, to complete a psychological evaluation. "Although the juvenile court has broad discretion in determining what programs and services in which a parent is required to participate, the requirements must relate to some behavior or circumstances that was revealed by the evidence." *Matter of R.G.,* 130 N.E.3d 1171, 1180 (Ind. Ct. App. 2019) (quoting *In re K.D.,* 962

N.E.2d 2d 1249, 1258 (Ind. 2012)), *trans. denied.* "Indeed, 'forcing unnecessary requirements upon parents whose children have been adjudicated as CHINS could set them up for failure with the end result being not only a failure to achieve the goal of reunification, but potentially, the termination of parental rights." *R.G.,* 130 N.E.3d at 1180 (citing *A.C. v. Marion Cty. Dep't of Child Sevs.,* 905 N.E.2d 456, 464-65 (Ind. Ct. App. 2009)).

[38]     Mother's specific argument is that Mother already participated in a psychological evaluation and that Mother was already participating in services and assessments on her own. In ordering her to do another evaluation, Mother argues, the trial court placed "an unnecessary hurdle in front of Mother that could unduly interfere with her ability to reunite with her children." Appellant's Br. p. 30. DCS, in response, argues that the previous evaluation, discussed at the CHINS fact finding hearing was "only an intake review" and not a complete psychological evaluation. Appellee's Br. p. 31.

[39]     We agree with DCS. The evidence presented was that this psychological evaluation would be requested by the service provider and that the evaluation was a different, and more comprehensive evaluation than the initial evaluation. We cannot say the trial court abused its discretion when it ordered Mother to participate in a more comprehensive psychological evaluation to determine the services that could best help Mother with her mental health needs.

## Conclusion

The trial court's findings that Mother's three children are CHINS are not clearly erroneous. Moreover, the trial court did not abuse its discretion in ordering Mother to participate in a psychological evaluation. We affirm.

Affirmed.

Najam, J., and Vaidik, J., concur.