

FILED

Aug 06 2019, 8:34 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Heather M. Schuh-Ogle
Columbus, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

In the Matter of:

R.G. (Child)

and

M.M. (Mother) and M.G. (Father),

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

August 6, 2019

Court of Appeals Case No. 19A-JC-598

Appeal from the Bartholomew Circuit Court

The Honorable Kelly S. Benjamin, Judge

The Honorable Heather M. Mollo, Magistrate

Trial Court Cause No. 03C01-1809-JC-5312

**Altice, Judge.**

**Case Summary**

[1] M.M. (Mother) and M.G. (Father) (collectively, Parents) appeal the trial court's order adjudicating R.G. (Child) to be a Child in Need of Services (CHINS). Parents present three issues for our review, which we restate as:

> 1. Did the trial court err in permitting a witness for the Department of Child Services (DCS) to testify telephonically at the fact-finding hearing?

> 2. Is the evidence sufficient to support the court's order adjudicating Child a CHINS?

> 3. Did the trial court abuse its discretion in ordering Parents to participate in services?

[2] We affirm.

## Facts & Procedural History

[3] Child was born to Parents on September 15, 2018. Mother has three other children, S.M. (born June 30, 2011), L.M. (born September 27, 2012), and A.M. (born December 19, 2015), for whom she is the custodial parent. Father has two other children, M.M.G. (born April 15, 2008) and W.G. (born January 14, 2012), for whom he is the custodial parent.

[4] DCS first became involved with Parents on August 13, 2018 (prior to Child's birth), upon receiving a report alleging "inappropriate discipline, home conditions, lack of food, no running water or working utilities, possible domestic violence in the home, as well as head lice for the children." *Transcript Vol. 2* at 131. Edisa Mrkaljevic, a DCS assessment worker, interviewed L.M.

and S.M. at their elementary school and then attempted to contact Parents by visiting the home. A relative was at the home but did not allow Mrkaljevic to enter.

[5] Mrkaljevic eventually contacted Mother and arranged to meet her and the children at a nearby park. Mrkaljevic spoke with Mother about the allegations. With regard to discipline, Mother indicated that she used "time outs, taking things away, spanking and occasionally using a belt." *Id*. Mother also acknowledged ongoing issues with head lice. As to the conditions of the house, Mother told Mrkaljevic that she could not give her permission to see the inside of the home because she did not own the home, but she assured Mrkaljevic that they had working utilities, appropriate sleeping arrangements, and sufficient food. Mrkaljevic also contacted Father, who gave her permission to speak with M.M.G. and W.G. but indicated that his mother owned the home and would not allow access.

[6] Mrkaljevic went back to the house on August 30, 2018, and Mother allowed her access to a camper that the family sometimes used. Mrkaljevic noted that the camper did not have appropriate bedding, there were no working utilities, and she was concerned about the amount of clutter. When Mrkaljevic walked in the camper, she almost fell through a hole in the floor. Having seen the conditions of the camper, DCS filed a motion to compel to gain access into the home. The court held a hearing on the motion on September 17, 2018, two days after Child was born. At the conclusion of the hearing, the court ordered Parents and Father's mother to permit DCS access to the inside of the home.

[7] When Mrkaljevic visited the home on September 19, 2018, she noted that the home had working utilities and sufficient food. She also observed laundry stacked up in the living room, missing ceiling tiles, ceiling tiles that had water damage and were caving in, walls in one bedroom appeared to have mold on them, puppy pads in the kitchen were soaked with urine, dirty floors, Parents' bedroom was "in huge disarray," and their bed was covered with pill bottles, clothes hangers, blankets, a supportive infant pillow, plastic bags, a stereo, and other miscellaneous items. *Id*. at 135. Mother indicated that Child was sleeping in that bed with her and Father. There was no other sleeping arrangement for Child, who was only four days old. Mrkaljevic discussed her concerns about Child's sleeping arrangement, and also spoke with Parents about cleaning up the home. She did not observe any bruises on Child, who was wearing only a diaper. Mrkaljevic returned later that day with a pack and play portable crib for Child to sleep in.

[8] Dr. Todd Baxter, a pediatrician, examined Child in the hospital approximately four hours after his birth. Dr. Baxter was not made aware of any difficulties or complications with Child's birth that would have caused injury to Child. During his examination of Child, Dr. Baxter noted only a genital abnormality that needed to be addressed by a specialist. Dr. Baxter saw Child one more time before Mother and Child were released from the hospital.

[9] Dr. Baxter saw Child at his office on September 20 for a routine, follow-up visit. During this visit Dr. Baxter observed what appeared to be a bruise, about a centimeter in size, on Child's right cheek. He also noted a "vague

discoloration over [Child's] lower rib cage" that was not present when he examined Child at the hospital. *Id*. at 58. Dr. Baxter could not discern whether the discolored area was "an evolving bruise or something potentially vascular in the skin." *Id*. Of greatest concern, however, was the injury on Child's cheek.

[10] Dr. Baxter discussed the bruise with Mother, but his concerns were not alleviated because Mother did not provide a plausible explanation as to how Child, then five days old, sustained a bruise on his cheek. Mother initially stated that she believed the mark was dirt and then suggested that Child could have been injured "by his older brother who was described as being kind of rowdy and throwing things in the house."[1] *Id*. Mother also questioned whether Child may have bumped against a crib. Dr. Baxter testified that a bruise on a baby is a concern "because they don't bruise just naturally through day to day contact." *Id*. at 59. Particularly when there is a sign of an unexplained injury around the head and neck, Dr. Baxter noted that such "can be a signal that it was not through an accidental injury" or, in other words, "indicative of physical abuse." *Id*. at 59, 63. Given his concerns, Dr. Baxter recommended x-rays, a head CT, and blood work (due to Father's family history of hemophilia). The results of the tests came back normal.[2] Nonetheless, because of the bruise,

---

[1] Mother was referring to A.M., who was two years old at the time.

[2] There was a "slight elevation in the PTT," which was part of the coagulation studies, so Dr. Baxter consulted with a hematologist who was not concerned with the elevated test result in a newborn. *Transcript Vol. II.* at 60. Also, the x-ray was reviewed by a radiologist who did not have specialized training in reading x-rays of children.

a report was submitted to DCS as well as the Child Protection Team at Riley Hospital for Children.

[11] After the report was reviewed by the Child Protection Team, additional concerns about Child's well-being emerged and DCS was again notified. Mrkaljevic discussed the report with Parents, but they minimized DCS's concerns, stating, "it's just a little bruise" and "every kid gets bruised." *Id.* at 149. On September 24, 2018, DCS requested emergency custody[3] of Child and all of his half-siblings because of Parents' inability to explain the injuries to Child, concerns about living conditions and recurrent lice, and educational neglect (for the school-aged children). The court granted the motion.

[12] Mrkaljevic then tried to locate the family by driving to their home and contacting the non-custodial parents. She also contacted the local elementary school and learned that Parents informed the school the family was moving to Kentucky. Mrkaljevic then contacted two school corporations in Kentucky as well as the sheriff's department. She was unable to locate the family. According to Mother, the family (except for one of Mother's children) moved to Kentucky on September 21, 2018, with plans to stay with a relative until they could find a place of their own. Shortly after moving to Kentucky, Father obtained employment and Parents found a house of their own.

---

[3] A probable cause affidavit submitted with the emergency request sets out additional injuries sustained by Child that were identified by members of the Child Protection Team.

[13]    Eventually, on October 17, 2018, Mrkaljevic successfully contacted Father via telephone, but he refused to tell her where they were. Shortly thereafter, the Kentucky DCS located Parents and detained Child and his half-siblings pursuant to the emergency custody order issued by the court in Indiana. The children were returned to Indiana, and Child, then a month old, was placed with maternal grandmother, where he remains. The other children were sent to different placements.

[14]    On October 18, 2018, Child had another x-ray. Dr. Megan Marine, a pediatric radiologist with Riley Hospital, reviewed the x-ray. She was also made aware of Child's previous x-ray and reviewed those scans on November 29, 2018. Dr. Marine determined that Child's x-rays from September 20, 2018 showed "a bucket handle appearance at the end of the left tibia bone, consistent with a fracture that is called a classic metaphyseal lesion," which was a different diagnosis than provided by the radiologist who initially reviewed the x-ray. *Transcript Vol. II* at 75. Dr. Marine believed that the injury occurred within five to seven days prior to the September 20 scan, which timeframe included Child's birth. Dr. Marine testified, however, that such an injury is not typically seen as a result of birth trauma unless perhaps the Child was born breech, which Child was not. Dr. Marine thus found Child's injury to be concerning for physical abuse. She explained that the type of fracture Child suffered would have resulted from a jerk or tug on the leg or some sort of force resulting from shaking. Dr. Marine acknowledged that her interpretation of the September 20 x-ray was different than the radiologist who initially read the x-ray as normal

but explained that it was common for a pediatric radiologist to have a different opinion given the extra training they receive. According to Dr. Marine, the October 18 x-ray showed that the tibia fracture had healed and that there was no permanent injury.

[15] After the children were removed, Parents were permitted supervised visitation. One visit was ended early because some of the children were running up and down the halls and the visitation facilitator became frightened by Parents' behavior. Specifically, Father got upset and raised his voice after the facilitator told them that if one child had to go to the restroom, they all had to go together. The facilitator's requirement in this regard was based on statements by Parents and/or one of the children that they were going to run. During this visit, Mother was also "[v]ery intimidating, very threatening." *Id.* at 16. Parents had two additional visits (November 14 and 17, 2018) supervised by Mrkaljevic. According to Mrkaljevic, Child remained in his car seat for the entire first visit and during the majority of the second. Mrkaljevic remained concerned about the children being returned to Parents' care.

[16] On October 19, 2018, DCS filed its petition alleging Child and his half-siblings to be CHINS. For Child, DCS alleged that he was a CHINS under Ind. Code § 31-34-1-1 (child seriously endangered by Parents' inability to supply him with necessary care and supervision) and I.C. § 31-34-1-2 (child seriously endangered due to injury by an act or omission of Parents). DCS also alleged that Child was presumed to be a CHINS under I.C. § 31-34-12-4 because he was injured while in Parents' care, the injury was not one that would ordinarily be sustained

except for an act or omission of Parents, and there is a reasonable probability it was not accidental.

[17] On December 3, 2018, DCS filed a motion requesting that the court permit Dr. Marine to testify telephonically at the upcoming factfinding hearing. In support of its motion, DCS asserted that it had just learned of Dr. Marine as a witness the previous week and that she was unavailable to testify in person due to her hospital responsibilities. The court granted DCS's motion on December 5, 2018. The following day, Mother filed an objection to DCS's motion for telephonic testimony, arguing that, pursuant to Ind. Admin. Rule 14, it was untimely and that DCS failed to show good cause.

[18] The court held a factfinding hearing on the CHINS petition on December 7, 10, and 18, 2018. At the start of the hearing on December 7, Mother reaffirmed her objection to Dr. Marine's telephonic testimony, but the court again overruled the objection. Mother reasserted her objection a third time, and Father joined in the objection, prior to Dr. Marine's telephonic testimony. The trial court, however, overruled the objection and permitted Dr. Marine to testify telephonically. On January 11, 2019, the court entered its order adjudicating Child a CHINS under I.C. §§ 31-34-1-1 and -2. The court also found that the presumption under I.C. § 31-34-12-4 applied.[4]

---

[4] The court found insufficient evidence to adjudicate Child's half-siblings to be CHINS because at the time of the fact-finding hearing, there was insufficient evidence about the home conditions and educational neglect

The court held a dispositional hearing on February 7, 2019. DCS Family Case Manager (FCM) Dustin Voelker recommended that Parents participate in homebased case management to address home conditions, parenting skills, coping skills, communication within the household, and budgeting. He also recommended that Parents engage in individual therapy to address their parenting techniques and anger management issues. FCM Voelker testified that if a service provider found Parents to have addressed and reached these goals, then the provider could request that the services be closed out. On March 13, 2019, the court entered its dispositional decree ordering Parents to participate in services, including homebased case management, individual therapy, and visitation. Parents now appeal. Additional facts will be provided as necessary.

## Discussion & Decision

### 1. Telephonic Testimony

Parents argue that the court erred in permitting Dr. Marine to testify telephonically during the CHINS factfinding hearing. Admin. R. 14(B) provides:

> [A] trial court may use telephone or audiovisual communications subject to:

since Parents had moved to Kentucky and there had been no assessment of their current living conditions or current review of school records.

(1) the written consent of all the parties, entered on the Chronological Case Summary; or

(2) upon a trial court's finding of good cause, upon its own motion or upon the motion of a party. The following factors *shall* be considered in determining "good cause":

> (a) Whether, after due diligence, the party has been unable to procure the physical presence of the witness;

> (b) Whether effective cross-examination of the witness is possible, considering the availability of documents and exhibits to counsel and the witness;

> (c) The complexity of the proceedings and the importance of the offered testimony in relation to the convenience to the party and the proposed witness;

> (d) The importance of presenting the testimony of the witness in open court, where the fact finder may observe the demeanor of the witness and impress upon the witness the duty to testify truthfully;

> (e) Whether undue surprise or unfair prejudice would result; and

> (f) Any other factors a trial court may determine to be relevant in an individual case.

(3) A party or a trial court if it is acting on its own motion *must* give notice of the motion to use telephone or audiovisual telecommunication as follows:

(a) Any motion for testimony to be presented by telephone or audiovisual telecommunication *shall* be served not less than thirty (30) days before the time specified for hearing of such testimony;

(b) Opposition to a motion for testimony to be presented by telephone or audiovisual telecommunication *shall* be made by written objection within seven (7) days after service;

(c) A trial court may hold an expedited hearing no later than ten (10) days before the scheduled hearing of such testimony to determine if good cause has been shown to present testimony by telephone or audiovisual telecommunication;

(d) A trial court *shall* make written findings of fact and conclusions of law within its order on the motion for testimony to be presented by telephone or audiovisual telecommunication; and

(e) For cause found, a trial court may alter the time deadlines set forth in paragraphs (a) through (c) upon motion made prior to the expiration of the time for the required action.

(Emphases supplied).

[21]     DCS does not dispute that its motion was filed less than thirty days before the hearing and that the trial court did not enter written findings of fact and conclusions of law in its order granting DCS's request to present Dr. Marine's testimony via telephone. Clearly, the court did not comply with the clear

dictates of Admin. R. 14. We therefore conclude that the trial court erred in permitting Dr. Marine to testify telephonically. As set out below, however, DCS presented other evidence of probative value to support the CHINS determination such that the court's error in this regard is harmless. *See* Ind. Appellate Rule 66 (providing that we shall not reverse on appeal if an error's "probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties").

## 2. Sufficiency

[22] Parents argue that the evidence does not support the determination that Child is a CHINS. "[T]he purpose of a CHINS adjudication is to protect children, not punish parents." *N.L. v. Ind. Dep't of Child Servs.*, 919 N.E.2d 102, 106 (Ind. 2010). Our Supreme Court has noted that "a separate analysis as to each parent is not required" in making a CHINS determination because a CHINS adjudication reflects the status of a child without establishing the culpability of a particular parent. *Id.* Put differently, a CHINS adjudication is not a determination of parental fault but rather is simply a determination that a child is in need of services and is unlikely to receive those services without the court's intervention. *Id.* at 105.

[23] "Because a CHINS proceeding is a civil action, the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). In reviewing the sufficiency of the evidence supporting a CHINS determination, we consider

only the evidence most favorable to the judgment and the reasonable inferences flowing therefrom. *In re J.L.*, 919 N.E.2d 561, 563 (Ind. Ct. App. 2009).

[24] Where, as here, a trial court enters findings of fact and conclusions of law in support of its CHINS determination, we apply a two-tiered standard of review. *Parmeter v. Cass Cnty. Dep't of Child Servs.*, 878 N.E.2d 444, 450 (Ind. Ct. App. 2007). First, we consider whether the evidence supports the findings, and second, whether the findings support the judgment. *Id*. We will not set aside the findings or judgment unless they are clearly erroneous. *Id*. Findings are clearly erroneous when the record contains no facts to support them either directly or by inference, and a judgment is clearly erroneous if it relies on an incorrect legal standard. *Id*. While we defer to the trial court's findings of fact, we do not do so as to its conclusions of law. *Id*. Additionally, we will not reweigh the evidence; rather, we consider the evidence favorable to the judgment and draw all reasonable inferences in favor of the judgment. *Id*.

[25] Parents first challenge several of the court's findings of fact as being clearly erroneous. We agree with Parents that the court's findings 4, 5, and 11 are unsupported by the evidence. In those findings, the court stated that "Dr. Todd Baxter was the presiding doctor at birth," that "Dr. Baxter did not have difficulties with mother's delivery that he believed could have caused injury to the child," and that "[a]s noted in paragraph 5 above, Dr. Baxter experienced no difficulties in mother's birth of the child." *Appellant's App. Vol. 2* at 90-91. The record is clear that Dr. Baxter was not the presiding doctor at birth, but rather, was Child's pediatrician, who examined Child for the first time

approximately four hours after his birth. In any event, Dr. Baxter did testify that Child was born vaginally and that he was not made aware of any difficulties or complications during Child's birth. Parents' remaining challenges to the court's findings are simply requests to reweigh the evidence, which we will not do.

[26] Parents also argue that DCS failed to prove by a preponderance of the evidence that Child is a CHINS under I.C. § 31-34-1-1 and I.C. § 31-34-1-2. They also challenge the court's determination that the rebuttable presumption under I.C. § 31-34-12-4 applied.

[27] We need not address Parents' arguments with regard to I.C. §§ 31-34-1-1 and -2 because we conclude that the court properly determined that the rebuttable presumption set out in I.C. § 31-34-12-4 applies in the instant case and that Parents failed to rebut the presumption. I.C. § 31-34-12-4 provides that there is a rebuttable presumption that a child is a CHINS

> because of an act or omission of the child's parent, guardian, or custodian if the state introduces competent evidence of probative value that:
>
> (1) the child has been injured;
>
> (2) at the time the child was injured, the parent, guardian, or custodian:
>
>> (A) had the care, custody, or control of the child; or

> (B) had legal responsibility for the care, custody, or control of the child;

> (3) the injury would not ordinarily be sustained except for the act or omission of a parent, guardian, or custodian; and

> (4) there is a reasonable probability that the injury was not accidental.

In other words, "[i]n cases where a child has injuries that suggest neglect or abuse, it shifts the burden to the party most likely to have knowledge of the cause of the injuries—the parent, guardian, or custodian—to produce evidence rebutting the presumption that the child is a CHINS." *Ind. Dep't of Child Servs. v. J.D.*, 77 N.E.3d 801, 807 (Ind. Ct. App. 2017), *trans. denied*.

[28] On September 20, 2018, Mother took Child, who was just five days old, to see Dr. Baxter for his first doctor's appointment. Dr. Baxter noted that Child had a bruise on his cheek and discoloration around his ribcage. Dr. Baxter had examined Child shortly after his birth and did not note any injuries or bruises associated with Child's birth or other abnormalities other than a genital abnormality. Mother herself admitted that Child did not have a bruise on his face the day before the office visit with Dr. Baxter and that a photograph taken on September 19 showed that Child did not have a bruise on his cheek or discoloration around his ribcage. Mrkaljevic also saw Child the day before and did not observe a bruise on his face. Child was in Parents' sole care and custody between DCS's visit on September 19 and the doctor visit the following day.

[29] Dr. Baxter testified that a bruise on a baby is concerning "because they don't just bruise naturally through day to day contact. And particularly when it's the head and neck region, that can be a signal that it was not through an accidental injury." *Transcript Vol. II* at 59. At the appointment, Mother was not able to provide a plausible explanation for Child's injury. Dr. Baxter ordered an x-ray, blood work, and other tests to exclude medical reasons as a possible explanation. He testified that if an injury "can't be explained through a very tangible event" or other medical cause, then such can be indicative of physical abuse. *Id*. at 64. Dr. Baxter reported his concerns to DCS.

[30] Through Dr. Baxter's testimony, DCS introduced evidence of probative value that Child suffered injuries while in the sole care and custody of Parents, Parents were unable to provide an explanation for the injuries, the injuries were not of the type that would ordinarily be sustained but for an act or omission of Parents, and there is a reasonable probability that the injuries were non-accidental. Given this evidence alone, the court's conclusion that the statutory presumption applied is supported by the evidence. Therefore, the court's CHINS determination with respect to Child is supported by sufficient evidence.

### 3. Dispositional Decree

[31] Parents argue that the court abused its discretion in ordering them to participate in services as part of the dispositional decree. Specifically, Parents argue that the ordered services are not tailored to reunifying the family and are not related to the reasons for Child's removal.

[32] "Although the juvenile court has broad discretion in determining what programs and services in which a parent is required to participate, the requirements must relate to some behavior or circumstances that was revealed by the evidence." *In re K.D.*, 962 N.E.2d 1249, 1258 (Ind. 2012) (quoting *In re A.C. v. Marion Cty. Dep't of Child Servs.*, 905 N.E.2d 456, 464-65 (Ind. Ct. App. 2009)). Indeed, "forcing unnecessary requirements upon parents whose children have been adjudicated as CHINS could set them up for failure with the end result being not only a failure to achieve the goal of reunification, but potentially, the termination of parental rights." *A.C.*, 905 N.E.2d at 464-65.

[33] Here, FCM Dustin Voelker recommended that Parents participate in homebased case management, individual therapy, and visitation. He explained that through these services, Parents could address home conditions, parenting skills, coping skills, communication within the household, and budgeting. He also testified that individual therapy will benefit Mother and Father by addressing any anger management issues. The court followed FCM Voelker's recommendation and ordered that Parents participate in homebased case management, individual therapy, and visitation.

[34] Clearly the ordered services are aimed at addressing the concerns of physical abuse—especially in a case where a newborn is found to have sustained unexplained injuries. That DCS had yet to identify specific service providers at the time of the dispositional hearing due to the fact that Parents now reside in Kentucky does not render the trial court's order that Parents participate in services an abuse of discretion. In this regard, we note that FCM Voelker

testified that he was "looking at the possibility of transferring the case to Kentucky." *Transcript Vol. II* at 219. The trial court did not err, or abuse its discretion, in ordering Parents to participate in the above-mentioned reunification services.

[35] Judgment affirmed.

Brown, J. and Tavitas, J., concur.