

FILED

Apr 16 2026, 9:10 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



I N  T H E

# Court of Appeals of Indiana

In the Matter of G.V. and A.V., Children in Need of Services, and M.V., (Mother),

*Appellant-Respondent*

v.

Indiana Department of Child Services, et al.

*Appellee-Petitioner*

---

April 16, 2026

Court of Appeals Case No.
25A-JC-1223

Appeal from the Marion Superior Court

The Honorable Geoffrey A. Gaither, Judge

Trial Court Cause No.
49D09-2501-JC-331
49D09-2501-JC-333

---

**Opinion by Judge DeBoer**

Judges Bradford and Weissmann concur.

**DeBoer, Judge.**

[1] M.V. (Mother) appeals the trial court's determination that her daughter, G.V., is a Child in Need of Services (CHINS) and its subsequent dispositional decree. She presents multiple arguments on appeal:

> (1) the Department of Child Services (DCS) failed to prove that:
>
> > (A) G.V. was seriously endangered, and
> >
> > (B) the court's coercive intervention was necessary; and
>
> (2) the court abused its discretion in finding in its dispositional decree that:
>
> > (A) DCS made reasonable efforts to prevent G.V.'s removal, and
> >
> > (B) it was in G.V.'s best interests that she be removed from Mother's care.

Finding no error, we affirm.

## Facts and Procedural History

[2] Mother has four children, two of whom were the subjects of the underlying CHINS proceedings. A.V. (born on May 15, 2015) is the daughter of Mother and M.M. (Father M). G.V. (born on January 2, 2024) is the daughter of

Mother and A.J. (Father J).[1] Mother had legal and physical custody of G.V. and unsupervised visits with A.V.[2]

[3] In January 2025, DCS received a report that Mother was physically abusing A.V. The report involved an incident that occurred while she was staying with Mother over her 2024 holiday break. A.V. told DCS that Mother took her into the bathroom, yelled and cussed at her, held her down, pulled her hair, and hit her with a slipper. A.V. had a scratch on her forehead, and she reported having another on her back. At the insistence of DCS, Father M took A.V. to the hospital two days later to be examined. The examination revealed bruising and scratches on A.V.'s arm and leg, a faint bruise on her right cheek, and a scratch on her forehead.

[4] A.V. also told DCS that she "saw [Mother] smack [G.V.] on the leg" and that "[i]t was loud and left a red mark." Appellant's Appendix Vol. 2 at 31. When a DCS family case manager (FCM) visited Mother's home to follow up on these reports, she observed a goose egg on G.V.'s head. Mother said the two girls had been playing and A.V. tripped, causing G.V. to hit her head. At the FCM's instruction, Mother took G.V. to Riley Children's Hospital for a pediatric evaluation. G.V.'s skeletal and head scans were normal and required no follow-up care. However, the doctors informed DCS that Mother provided

---

[1] Father J was incarcerated throughout these proceedings.

[2] Father M had primary custody of A.V. for approximately a year and a half leading up to the proceedings.

inconsistent stories about how G.V. was injured and, given the nature of her and A.V.'s injuries, they had "grave concerns" about what had caused them. Transcript at 58.

[5] Based on the doctors' concerns, a DCS manager instructed a different FCM to remove G.V. from Mother's care while they were still at the hospital without a court order. As the FCM attempted to remove G.V., Mother began "running through the ER lobby . . . toward the exit" with G.V. in her arms and had to be restrained by security. *Id.* at 67. She "was physically trying to wrestle away from security . . . hitting against the wall, against the doors, all while having [G.V.] in her arms." *Id.* When the FCM was finally able to talk to her, Mother was "very frantic . . . ." *Id.* at 68. A few days later, DCS filed petitions alleging A.V. and G.V. were CHINS, and both girls were placed in Father M's care.

[6] Before the fact-finding hearing, Mother participated in supervised visitation with the girls. The first visit provider ended the visits after only three sessions because there was "frequent conflict" between Mother and A.V. *Id.* at 11. Mother's communication with A.V. during the visits was "not appropriate[,]" and Mother did not adhere to the provider's attempts to redirect. *Id.* at 12. While Mother and A.V. were arguing during one of the visits, Mother told her that A.V. would go to jail when she got older. The provider also witnessed Mother physically "[d]rag [A.V.] into the room" and expressed general concern for A.V.'s emotional and physical safety. *Id.* at 18. And while the provider did not express any safety concerns related to G.V., she recommended therapeutic

visitation for the family. Ultimately, Mother was referred to a second provider for general supervised visitation.

[7] The second provider only completed two visits with Mother and the girls, the first of which took place at the Children's Museum. At the beginning of the visit, Mother changed G.V.'s diaper on the floor of the lobby where there was heavy foot traffic. Mother also let G.V. play in the water exhibit which worried the provider given how cold it was that day. However, Mother had brought along a few changes of clothes for G.V. as well as winter pants and a coat. During Mother's second visit, she continued to hold G.V. despite the child expressing her desire to be put down. The provider observed that G.V. acted happier after she was out of Mother's arms and could play with A.V., and she ran away from Mother whenever Mother approached her. As for A.V. and Mother, they argued throughout the visit. Specifically, Mother told A.V. she hated her, that "God [was] going to get" her, and she implied that her eighteen-year-old daughter (who did not live with Mother) would have done something to A.V. if she had been there. *Id.* at 34. At one point, Mother admitted to the provider that she would hit A.V. when "she was being disrespectful." *Id.* at 43. She also said she had held her down and smacked her in the face; specifically, said she had hit her in the face with a roll of wrapping paper before. Mother also admitted that she would "pop [G.V.'s] hand" or leg if she did something she wasn't supposed to do. *Id.* at 48. After two visits with the second provider, Mother asked for the visits to stop.

[8]  In March, the trial court held a fact-finding hearing on the CHINS petitions. Mother, Fathers M and J, three FCMs, the two visitation providers, and a friend of Mother's testified to the above facts. The court also took judicial notice of Mother and Father M's paternity case involving A.V.[3] One of the FCMs testified that Mother admitted to smacking G.V. and leaving red marks on her. Mother, however, testified she would "pat [G.V.] on the hand" only if she was doing something dangerous. *Id.* at 100. In reference to the holiday break incident with A.V., Mother said, "I went in the bathroom because there's a fan on there [sic], I have neighbors, I don't want them to be thinking anything's going on that I'm beating my kid . . . ." *Id.* at 94. She also acknowledged she "might have made a bad judgment and error trying to spank [A.V.] and it got out of control, but that's really all it was[,] that [she] was trying to discipline her . . . ." *Id.* at 95. When asked to expand on that, Mother said,

> Well, when I grew up it was okay to spank your kids, . . . it was okay to discipline your children by doing that. But now it seems you can't discipline your kids any type of way. You can't smack them, you can't spank them on their butt, you cannot do anything . . . .

*Id.*

---

[3] *See* Cause No. 49D09-1707-JP-311. In April 2023, the same judge presiding over this CHINS matter assumed jurisdiction over the paternity case.

[9]     When asked if he had ever seen Mother discipline A.V. and what that looked like, Father M said it included "[y]elling, cursing, . . . hitting her with different objects, belts, brushes, spatulas, wooden spoons, [and] cords." *Id.* at 74. He also described behavioral issues he had observed from G.V. when she was placed with him, such as "freak[ing] out" if she were told no and pulling her hair when she was upset. *Id.* at 76. As she spent time with Father M, those behaviors dissipated. He expressed concern for A.V. and G.V. if they were returned to Mother's care at that time. In discussing services related to the paternity case, Father testified that Mother had not completed any of the services she was ordered to complete, such as following doctors' orders, completing mental examinations, parenting classes, individual therapy, or therapy with A.V. Mother explained that she had not done the recommended therapy with A.V. because when she asked A.V., "[D]o you think you and I need to be in therapy together?" A.V. said, "No, mommy." *Id.* at 98. However, Mother had been in individual therapy for almost a year.

[10]    After DCS rested its case, Mother moved to dismiss the petition as to G.V., arguing that "DCS ha[d] not met its burden" and "there [was] no correlation between the bruise on [G.V.'s] head and any act or inaction [Mother] herself did." *Id.* at 118. The court denied the motion and, after closing arguments, found both A.V. and G.V. were CHINS. Mother then requested G.V. be returned to her care on a trial home visit (THV), which the court denied. The court later entered its order with findings of fact and conclusions of law. After the dispositional hearing, the trial court entered its April dispositional order

continuing the girls' placements with Father M. In addition to the standard requirements under a dispositional order, Mother was required to complete a psychological evaluation and family functional assessment and participate in therapy. Mother renewed her request for a THV with G.V., which the court again denied.

[11] Mother then filed an appeal to this Court. However, the trial court's findings of fact and conclusions of law were inadequate and left us unable to address the merits of Mother's arguments. *See In re G.V.*, 274 N.E.3d 996, 1002 (Ind. Ct. App. 2026). As such, we remanded this matter back to the trial court with instructions for it to enter proper findings and conclusions, and we held this matter in abeyance in the interim. *Id.* The court entered amended findings on February 9, 2026[4] consistent with the recitation of facts above, and the parties

---

[4] The trial court's first fact-finding order "was merely a signed copy of the proposed findings and conclusions submitted by DCS." *G.V.*, 274 N.E.3d at 1001. In our opinion remanding this matter back to the court for proper findings and conclusions, we noted that "[w]hen a trial court accepts verbatim a party's proposed findings of fact and conclusions thereon, [such] practice 'weakens our confidence as an appellate court that the findings are the result of considered judgment by the trial court.'" *Id.* (quoting *Staff Source, LLC v. Wallace*, 143 N.E.3d 996, 1009 (Ind. Ct. App. 2020)). Thus, it is disappointing that on remand, the court's amended findings reflect it did the same thing again—simply signing a copy of DCS's second iteration of proposed findings. While the practice is not prohibited, courts must "remember that when it signs one party's findings, it is ultimately responsible for their correctness." *Parks v. Delaware Cnty. Dep't of Child Servs.*, 862 N.E.2d 1275, 1278 (Ind. Ct. App. 2007), *superseded by statute on other grounds* in *In re R.G.*, No. 20A-JC-1379 (Ind. Ct. App. Jan.7, 2021) (mem.). Having compared the court's original order with its amended order, it's clear that DCS, and thus the court, simply deleted from its original order the words "testified," "stated," or "reported" in many instances. *Compare, e.g.*, Appellant's App. Vol. 2 at 228 ("[The FCM] *stated that* [Father M] reported to her that [A.V.] was coming back from visits with her mom with bruises and that her mother would call him to have him pick the child up early.") (emphasis added) *with* Appellant's Supp. App. Vol 2 at 44 ("[A.V.] was coming back from visits with [Mother] with bruises and that [sic] her [M]other would call [Father M] to have him pick the child up early."). Although we expected the court would take care to assure us it had come to a well-reasoned CHINS finding the second time around, we remain dubious that the amended order reflects the trial court's considered judgment.

filed new briefs addressing those new findings. *See* Supplemental App. Vol. 2 at 43. We now turn to the merits of Mother's appeal.[5]

# Discussion and Decision

[12]   Mother presents two overarching arguments on appeal. First, she claims DCS failed to prove G.V. was a CHINS. Next, she contends the court abused its discretion in allowing G.V.'s continued removal from her care. We address each argument in turn.

## 1. CHINS Adjudication

### *1.1. Standard of Review*

[13]   The primary focus of a CHINS proceeding is to "safeguard a child's best interests." *In re E.K.*, 260 N.E.3d 901, at 909 (Ind. 2025). Courts endeavor to protect children, not punish parents. *Id.* As such, "the courts and DCS must make 'all decisions . . . in consideration of the best interests of the child or children concerned,' I.C. § 31-10-2-2(2), with ensuring the child's safety 'the most important consideration,' I.C. § 31-10-2-1.5." *Id.* The trial court found G.V. was a CHINS under both Indiana Code section 31-34-1-1[6] (CHINS-1) and section 31-34-1-2(a) (CHINS-2). Pursuant to the former, DCS must prove:

> (1) the child's physical or mental condition is seriously impaired
> or seriously endangered as a result of the inability, refusal, or

---

[5] Mother does not challenge the CHINS determination as to A.V.

[6] The Indiana General Assembly amended this statute during the 2026 Legislative Session, but that amendment does not become effective until July 1 and is otherwise irrelevant to this appeal.

neglect of the child's parent[] . . . to supply the child with
necessary food, clothing, shelter, medical care, education, or
supervision:

> (A) when the parent[] . . . is financially able to do so; or

> (B) due to the failure, refusal, or inability of the parent[] . .
> . to seek financial or other reasonable means to do so; and

(2) the child needs care, treatment, or rehabilitation that:

> (A) the child is not receiving; and

> (B) is unlikely to be provided or accepted without the
> coercive intervention of the court.

I.C. § 31-34-1-1.  Our Supreme Court has distilled this statute down into three elements DCS must prove: (1) "the parent's actions or inactions have seriously endangered the child[;]" (2) "the child's needs are unmet[;]" and (3) "those needs are unlikely to be met without State coercion."  *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014), *reh'g denied*.  DCS must prove these elements by a preponderance of the evidence.  I.C. § 31-34-12-3.

[14]  Where, as here, a trial court has entered findings of fact and conclusions of law sua sponte, we apply a two-tiered standard of review.  *In re K.W.*, 178 N.E.3d 1199, 1210 (Ind. Ct. App. 2021).  We determine "whether the evidence supports the findings and whether those findings support the judgment."  *E.K.*, 260 N.E.3d at 909.  We do not reweigh evidence or judge witness credibility but

rather "consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom." *S.D.*, 2 N.E.3d at 1287 (quoting *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012)), *reh'g denied*. Ultimately, we will affirm the CHINS determination unless Mother proves it was clear error. *K.W.*, 178 N.E.3d at 1210.

[15] In contending there was insufficient evidence to support the CHINS determination, Mother challenges many of the court's amended findings as clearly erroneous. We note that erroneous findings do not necessarily constitute reversible error. *In re B.J.*, 879 N.E.2d 7, 20 (Ind. Ct. App. 2008), *trans. denied*. Rather, where the unchallenged findings "provide ample support for the trial court's ultimate conclusion[,]" an erroneous finding is "merely harmless surplusage . . . ." *Id.*

### 1.2. Challenged Findings

[16] Mother first challenges Findings [6]C and [6]G. These findings pertained to observations made during Mother's supervised visits. She asserts that Finding [6]C is in error because the trial court found that Mother's decision to change G.V.'s diaper on the floor of the museum's lobby "caus[ed] concerns for [her] safety given her age." Appellant's Supp. App. Vol. 2 at 44. Mother claims the visit provider merely testified that she found Mother's choice to do so "odd" but did not intervene. Tr. at 29. However, Mother ignores that later in her testimony, the provider confirmed that she considered it a safety concern because it was "one of the busiest days [at] the museum" and there were

"hundreds of people [walking] through . . . ." *Id.* at 46-47. The court was allowed to credit the provider's testimony and find that changing a toddler's diaper on the ground in a public area with high foot traffic caused some concerns for G.V.'s safety. Mother has failed to show this finding was clearly erroneous.

[17] As for Finding [6]G, the trial court found that Mother had told A.V. "she hated her and threatened her in front of [G.V.] and the visitation provider." Appellant's Supp. App. Vol. 2 at 44. Mother takes issue with the court's use of the word "threatened." At the fact-finding hearing, the visitation provider testified that Mother told A.V. that "she hate[d] her[,] . . . God [was] going to get" her, and she implied that if Mother's older daughter had been there that she would have done something to A.V. Tr. at 34. We find the court was well within its discretion to characterize the nature of Mother's statements here as threats even though the provider did not use the word "threatened" in her testimony. Finding [6]G is not clearly erroneous.

[18] She also challenges Finding [7]G as clearly erroneous because it "rests entirely on a third-hand summary of unidentified concerns from unidentified sources about unspecified inconsistencies." Appellant's Amended Brief at 24. In that finding, the court found that Mother had provided doctors with inconsistent stories about the cause of G.V.'s injuries. *See* Appellant's Supp. App. Vol 2 at 45. She complains that DCS did not call the physicians from Riley Children's Hospital to testify about Mother's stories or their concerns. However, Mother did not object to this testimony from the FCM at trial. And the FCM testified

to what she knew—"the physicians at the hospital[] . . . had received a couple different stories, so they had grave concerns" about G.V.'s injuries. Tr. at 58. The trial court specifically found the FCM's testimony "reliable[,]" and it was permitted to take that fact into consideration. Appellant's Supp. App. Vol. 2 at 44. Mother is merely requesting we reconsider the weight attached to that testimony, which is outside the scope of what we are tasked to do in this case. Finding [7]G is not clearly erroneous.

[19]     Mother then challenges Findings [8]A and [8]C pertaining to her behavior at Riley Children's Hospital. She claims the trial court mischaracterized the incident as a safety risk given that G.V. was not injured, and the FCM only described Mother's behavior that day as "concerning" rather than "wrong." Appellant's Am. Br. at 39. However, the court's findings that G.V. was placed "in physical danger" and was retrieved by the FCM "for [her] safety" were reasonable inferences for the court to make in light of the evidence. Appellant's Supp. App. Vol. 2 at 45. The FCM testified that while holding G.V., Mother was running around the lobby, had to be restrained by security, "physically tr[ied] to wrestle away from" them, and "was hitting against the wall [and] the doors . . . ." Tr. at 67. While we understand Mother might have had strong reactions when her child was removed from her care, it did not preclude the court from inferring that Mother's actions placed G.V. at risk of physical harm. Mother is correct that G.V. was not injured in the incident, but the court's findings did not say or imply that she was hurt. Rather, the court reasonably

inferred that G.V.'s safety was at risk in that moment, and Mother has failed to prove that such inference is clearly erroneous.

[20]     Mother also challenges the following findings:

> [5]D.  [The visit provider] had to redirect [M]other during her visits in how she spoke to the children and . . . [M]other does not listen when redirected.
>
> . . . .
>
> [6]D.  Mother allowed [G.V.] to play in the water without an appropriate change of clothes despite it being extremely cold outside.
>
> . . . .
>
> [6]L.  Mother was physically smacking [G.V.'s] leg and "popping" her hand in the presence of the visitation provider as a form of physical discipline.
>
> . . . .
>
> [11]C.  [M]other admits to having bad judgment and made [sic] an error when physically disciplining her children.

[11]53.[7] [M]other was recommended to do things in her custody order including therapy with [A.V.] but is refusing therapy with [A.V.] as she finds it unnecessary.

Appellant's Supp. App. Vol. 2 at 44, 46.

With Finding [5]D, Mother is correct that the first visitation provider testified that Mother only spoke inappropriately to A.V., not G.V. The provider said Mother was appropriate with G.V. and she had no concerns for her safety. *See* Tr. at 12-13. Thus, we agree with Mother that Finding [5]D is erroneous regarding the implication that Mother spoke inappropriately to *both* girls when the testimony only supports that she did so to A.V. Finding [6]D is also erroneous because Mother had two extra outfits to change G.V. into as well as snow pants and a coat. Finding [11]C is similarly erroneous because Mother only admitted to having bad judgment in her choice of discipline as to A.V., not G.V. Nonetheless, in light of the court's other findings which are sufficient to support the CHINS determination, we find these errors are harmless. *See B.J.*, 879 N.E.2d at 20 (holding an erroneous finding was harmless "[b]ecause there [was] evidence sufficient to support the trial court's ultimate findings on the elements necessary to sustain the judgment").

Mother challenges Finding [6]L on the grounds that there was no evidence she hit or "popped" G.V. in front of the visitation provider. Indeed, the provider

---

[7] We note that this odd numbering appears to be a typographical error derived from DCS's resubmitted proposed findings which was carried over into the trial court's amended order.

testified that she "wasn't there when [Mother] popped her." Tr. at 51. Nonetheless, Mother *admitted* to the provider and at the fact-finding hearing that she does "pop" G.V. as a form of discipline, so we find the error in Finding [6]L is harmless. Mother also alleges error as to Finding [11]53 because she testified that it was A.V. who did not want to participate in therapy with her, not the other way around. However, we are inclined to agree with the State that "Mother is the parent, not . . . A.V.[,]" and "[i]t was a reasonable inference from this testimony that Mother did not find it necessary to engage in therapy with" A.V. Appellee's Am. Br. at 21. Regardless, the record shows Mother did not participate in therapy with A.V. as recommended in the paternity case. Thus, we find any error in the court's finding is harmless. We now turn to Mother's arguments regarding the sufficiency of the evidence.

### 1.3. Serious Endangerment and Unmet Needs

[23] Mother asserts that she "did not seriously endanger [G.V.] by failing to provide her with the necessary food, clothing, shelter, medical care, education, or supervision." Appellant's Am. Br. at 29. She contends the court's conclusion that G.V. was seriously endangered was mostly a result of "the court bundling the two children into one, . . . contradict[ing] the individualized CHINS assessment required by law." *Id.* at 31. To be sure, "each CHINS determination is very specific to the condition of that particular child." *In re J.C.*, 3 N.E.3d 980, 984 (Ind. Ct. App. 2013). However, Mother does not contend, nor do we conclude, that a parent's treatment of one child in the home is irrelevant to whether another child in the home is a CHINS. Notably,

Indiana's appellate courts have consistently held that evidence of domestic violence in a child's presence can support a CHINS determination. *See In re N.E.*, 919 N.E.2d 102, 106 (Ind. 2010) (affirming a CHINS adjudication only based on evidence of "several incidents of domestic violence against [the] [m]other in the presence of her children"); *K.A.H. v. Ind. Dep't of Child Servs.*, 119 N.E.3d 1115, 1121 (Ind. Ct. App. 2019) ("[A] single incident of domestic violence in the child's presence may support a CHINS finding, and it need not necessarily be repetitive."). And while not necessarily sufficient in and of itself, the abuse of one child in the home is undoubtedly violence, and we see no reason why it could not—let alone should not—serve as evidentiary support for a CHINS determination.

[24] We agree with the State that because G.V. "lived with Mother in the home, it is a reasonable inference that she was exposed to the violence directed at" A.V.[8] Appellee's Am. Br. at 31. And it is undisputed that G.V. was present at the supervised visits and witnessed Mother's inappropriate language and behavior toward A.V. The record shows that Mother's admitted physical punishment of

---

[8] In *In re E.M.*, our Supreme Court recognized the impact exposure to violence can have on younger children, including infants and toddlers. 4 N.E.3d 636, 644 (Ind. 2014) ("A lack of beatings . . . does not equate to a lack of abuse, nor does the children's tender age equate to a lack of harm."). Critically, "'[y]ounger children generally do not have the ability to express their feelings verbally'—so their 'observable reactions . . . may not tally with their emotional reactions,' and '[i]t may take some time before children are able to show any reaction at all' despite being affected." *Id.* at 645 (quoting ABIGAIL STERNE ET AL., DOMESTIC VIOLENCE AND CHILDREN: A HANDBOOK FOR SCHOOLS AND EARLY YEARS SETTINGS 20 (2010)). The Court concluded that, "[b]ased on the older []siblings' PTSD diagnoses and the younger children's even greater vulnerability to psychological harm, the trial court was within its discretion to find that [f]ather's violence against [m]other had also abused" their one-year-old and infant sons. *Id.*

A.V., which the court found crossed the line into abuse, left G.V. without a home free from violence. *See Matter of A.W.*, No. 25A-JC-1435, at \*4 (Ind. Ct. App. Dec. 22, 2025) (mem.) (concluding "the children's need to reside in a safe home free from violence was not being met[,]" in part because of the father's "excessive physical punishment of the children"). The court was within its discretion to use this broader context of Mother's treatment of A.V. to inform its understanding of the other evidence pertaining to G.V. and how she was impacted, specifically G.V.'s resistance to Mother and preference for A.V. at visits, her distressed behavior early on in placement, the concerning bruise on her head, Mother's inconsistent stories about G.V.'s bruise, and the "popping" of G.V.'s hands and legs that left red marks.

[25] In sum, Mother has not shown the trial court erred in finding that G.V. was seriously endangered and had unmet needs as a result of her actions.

### 1.4. Coercive Intervention

[26] Mother also contends "DCS failed to show that coercive intervention of the court was necessary to care for [G.V.] because [Mother] provided good care already and did not reject services." Appellant's Am. Br. at 44. Under the coercive intervention prong, "the question is whether the parents must be coerced into providing or accepting necessary treatment for their child." *In re N.E.*, 198 N.E.3d 384, 390 (Ind. Ct. App. 2022) (quoting *In re E.K.*, 83 N.E.3d 1256, 1262 (Ind. Ct. App. 2017), *trans. denied*). "The same evidence used by the court to determine that a parent's acts or omissions injured or endangered a child may also support that coercive intervention is necessary to safeguard the

child." *Id.* We note that not every endangered child requires the coercive intervention of the court. *See E.K.*, 83 N.E.3d at 1262-63 (concluding court intervention was unnecessary "where the parents [were] fully cooperative in addressing" a single incident in which the father excessively disciplined the child); *In re D.J.*, 68 N.E.3d 574, 581 (Ind. 2017) (concluding coercive intervention was unnecessary where "Parents eventually cooperated with the Department's services and had satisfactorily completed all services . . . by the time of the fact-finding hearing"). Nonetheless, a court doesn't have to wait until tragedy strikes before determining that a child is a CHINS. *E.K.*, 83 N.E.3d at 1261.

[27] Here, the State is correct that "[w]ithout acknowledging the excessive discipline that occurred and the unsafe living environment that resulted, [Mother] could not make progress without being forced to do so." Appellee's Am. Br. at 37. Indeed, Mother maintained throughout the proceedings that there was nothing wrong with her disciplinary decisions regarding G.V., and further confirms on appeal that she "never expressed regret or acknowledged error in how she disciplined" G.V. Appellant's Am. Br. at 34. Additionally, by the time of the fact-finding Mother had not completed the family functional assessment DCS referred her to, and she told DCS she would not continue to attend therapeutic visits after only participating in a few. She also stopped supervised visitation after only two visits with her second provider. Mother notes, and we acknowledge, that she was in individual therapy by the time of the fact-finding

hearing. However, that fact was before the trial court, and we will not substitute our judgment and reweigh it against the other evidence in the record.

[28] Mother likens her circumstances to those in *E.K.* and *D.J.*, where appellate courts reversed CHINS determinations because the evidence was insufficient to show coercive intervention was necessary. In *E.K.*, DCS intervened because on one occasion, the father had spanked his three-year-old child "too hard in an effort to cease an ongoing temper tantrum." 83 N.E.3d at 1261-62. A panel of this Court found that even though the single incident of excessive punishment endangered the child, there was no evidence showing the court's intervention was necessary. *Id.* at 1262. The court noted there was no evidence that the father had ever used excessive discipline in the past or that the child had been observed to have "inappropriate marks or bruises" on his body. *Id.* It further reasoned that DCS never sought to remove the child from the home and the parents fully cooperated with DCS, including voluntarily engaging in services and signing and following a safety plan to refrain from corporal punishment. *Id.* The court concluded that "[o]ne lapse in judgment by [f]ather [was] not enough to warrant a CHINS finding for [the child], where the parents [had] been fully cooperative in addressing that lapse." *Id.* at 1262-63. Essentially none of the facts from *E.K.* are present in Mother's case—the evidence did not evince a one-time lapse in judgment but rather a pattern of inappropriate disciplinary behavior to and around G.V. and little acknowledgement or cooperation from Mother in addressing it.

[29] Similarly, *D.J.* is distinguishable from Mother's case. There, the mother's "decision to leave [her children] alone, unsupervised in a bathtub for two minutes, seriously endangered their physical or mental condition" as did the "unkempt, unclean, foul-smelling home." 68 N.E.3d at 580. However, by the time of the fact-finding hearing, the parents had fully cooperated with DCS, completed all of their services, and met all of their goals. *Id.* at 581. The same cannot be said here as the record shows Mother had neither completed all of her services by the time of the fact-finding hearing nor had she been consistently cooperative with DCS. Thus, we are unpersuaded by Mother's reliance on these cases. And in light of the record and the court's findings, Mother has failed to show the court erred in concluding that its coercive intervention was necessary.[9]

[30] For the foregoing reasons, we find there was sufficient evidence to support the trial court's CHINS determination. We thus turn to Mother's next argument.

## 2. Removal

[31] Mother further argues the trial court abused its discretion by continuing G.V.'s removal from her care in its dispositional order. Specifically, she asserts it abused its discretion by: (1) finding DCS provided reasonable efforts to prevent

---

[9] Because the trial court's findings support its judgment that G.V. is a CHINS under the CHINS-1 statute, we need not address whether the same is true under the CHINS-2 statute. *See In re R.G.*, 130 N.E.3d 1171, 1179 (Ind. Ct. App. 2019) (court affirming CHINS adjudication under one statute and declining to address sufficiency of the evidence under two others), *trans. denied*.

removal, and (2) supporting the removal with "statutorily deficient" reasons. Appellant's Am. Br. at 51.

### 2.1. Standard of Review

[32] After a dispositional hearing, the court must enter an order enumerating the plan of care, treatment, or the necessary rehabilitation to address the child's needs. *K.D.*, 962 N.E.2d at 1257; *see* I.C. § 31-34-19-10(a)(1). The dispositional order must also detail the efforts made to prevent the child's removal or to reunite the child and parent. I.C. § 31-34-19-10(a)(3). The court's order is reviewed for an abuse of discretion. *In re R.G.*, 130 N.E.3d 1171, 1181 (Ind. Ct. App. 2019), *trans. denied*.

### 2.2. Reasonable Efforts

[33] First, Mother contends the trial court abused its discretion in finding DCS used reasonable efforts to prevent G.V.'s removal. She claims "DCS failed to carry its 'emergency' theory through the factfinding" and thus, without evidence of an emergency, DCS had to prove it took reasonable steps to help the family before removing G.V. Appellant's Am. Br. at 49. We disagree with Mother's premise. The FCM testified that she was instructed by her manager to remove G.V. from Mother's care without a court order because the physicians had "grave concerns" about G.V.'s well-being due to the different stories Mother had given to explain G.V.'s injury. Tr. at 58. These facts do not evince an abandonment of DCS's position that G.V.'s removal was an emergency. And pursuant to Indiana Code section 31-34-2-3(a)(3), where, among other requirements, "consideration for the safety of the child precludes the immediate

use of family services to prevent removal of the child[,]" DCS can remove the child without a court order. This statute specifically contemplates that certain emergency situations may necessitate removal *before* reasonable efforts can be used in attempt to keep the child in her parent's home. As such, we find Mother's argument unpersuasive.[10]

[34] Mother also takes issue with the court's incorporation of "[t]he statements of reasonable efforts as set forth in the pleadings, reports, and documents of DCS and/or all other service providers filed herein" into its reasonable efforts finding. Appellant's Am. Br. at 49-50 (alteration in original). In support of this argument, she asserts that "[a] CHINS adjudication must be based on the evidence presented in court and not on the allegations in the pleadings." *Id.* at 50 (citing *Maybaum v. Putnam Cnty. Off. of Fam. & Child.*, 723 N.E.2d 951, 954 (Ind. Ct. App. 2000)). While we agree that CHINS adjudications must be based on the evidence and not the pleadings, the court's finding of reasonable efforts in its *dispositional* order did not pertain to the CHINS adjudication, which was separately supported by its fact-finding order. Mother offers no explanation as to why the dispositional decree, entered after the court has

---

[10] To the extent Mother argues DCS failed to use reasonable efforts to reunify after G.V.'s removal and before the fact-finding hearing, we also find it unpersuasive. *See* I.C. § 31-34-21-5.5(b) (requiring DCS to use reasonable efforts to reunify "[i]f a child has been removed from [their] home"). Before the fact-finding hearing and in conjunction with Mother's services from the paternity case, DCS provided Mother supervised visitation and entered a referral for her to complete a family functional assessment, psychological assessment, and therapy for both her and A.V. *See* Tr. at 112, 114. Although Mother participated in individual therapy, she ended visitation, did not complete either assessment, and she failed to attend therapy with A.V. prior to the fact-finding hearing. This evidence shows that DCS provided her reasonable efforts after G.V.'s removal, so to the extent she argues otherwise, her argument fails.

already adjudicated the children CHINS and found DCS proved the allegations in its petition, cannot reference the pleadings and reports regarding the issue of reasonable efforts. Notably, Indiana Code section 31-34-19-10(b) expressly permits incorporation of the predispositional report in the dispositional decree. Mother is correct that DCS did not offer her any services in this case prior to removing G.V., however, that is consistent with emergency removal. Thus, the predispositional report properly enumerated future services it would offer Mother to prevent G.V.'s *continued* removal from her care. In these circumstances, Mother has not persuaded us that the trial court abused its discretion in finding DCS used reasonable efforts to prevent G.V.'s removal.

### 2.3. Best Interests

[35]  Mother's second challenge to the dispositional decree also fails. The trial court found it was "in the best interests of the [C]hildren to be removed from the home environment . . . because[] of the allegations admitted." Appellant's App. Vol. 2 at 235. Mother asserts her meaningful admissions only referenced A.V. However, Mother undoubtedly admitted to hitting G.V. and leaving red marks on her. Additionally, the court supplemented its best interest analysis in the amended fact-finding order, finding placement outside the home was in the Children's best interest "because[] of an inability, refusal[,] or neglect to provide shelter, care, and/or supervision at the present time." Appellant's Supp. App. Vol. 2 at 46. Given this finding and Mother's admissions that she "pops" G.V. and her discipline of A.V. had been excessive, we cannot say the trial court abused its discretion in concluding that removal was in G.V.'s best interests.

## Conclusion

For the foregoing reasons, we affirm the trial court's adjudication of G.V. as a CHINS and its dispositional decree continuing her removal from Mother's care.

Affirmed.

Bradford, J., and Weissmann, J., concur.

ATTORNEYS FOR APPELLANT

Talisha Griffin
Marion County Public Defender Agency
Indianapolis, Indiana

Suzy St. John
Indiana University Robert H. McKinney School of Law Appellate Clinic
Indianapolis, Indiana

Sarah Y. Faulkner
Certified Legal Intern
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE INDIANA DEPARTMENT OF CHILD SERVICES

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

Marjorie Lawyer-Smith
Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE KIDS' VOICE OF INDIANA

Katelyn Bacon
Indianapolis, Indiana